UNITED STATES v. CHANDLER–DUNBAR WATER POWER COMPANY.

CHANDLER–DUNBAR WATER POWER COMPANY v. UNITED STATES.

ST. MARYS POWER COMPANY v. UNITED STATES.

BROWN, RECEIVER OF THE MICHIGAN LAKE SUPERIOR POWER COMPANY, v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

Nos. 783, 784, 785, 786.   Argued April 28, 1913.—Decided May 26, 1913.

The technical title to the beds of navigable rivers of the United States is either in the States in which the rivers are situated, or in the riparian owners, depending upon the local law.

Upon the admission of Michigan as a State into the Union the bed of the St. Marys River passed to the State; under the law of Michigan a conveyance of land bordering upon a navigable river carries the title to the middle thread.

The title of the riparian owner to the bed of a navigable stream is a qualified one, and subordinate to the public right of navigation and

subject to the absolute power of Congress over the improvement of navigable rivers.

Under the Constitution, Congress can adopt any means for the improvement of navigation that are not prohibited by that instrument itself.

Commerce includes navigation and it is for Congress to determine when and to what extent its powers shall be brought into activity. *Gilman* v. *Philadelphia*, 3 Wall. 713.

The judgment of Congress as to whether a construction in or over a navigable river is or is not an obstruction to navigation is an exercise of legislative power and wholly within its control and beyond judicial review; and so *held* as to the determination of Congress that the whole flow of St. Marys River be directed exclusively to the improvement thereof by the erection of new locks therein.

The flow of the stream of a navigable river is in no sense private property, and there is no room for judicial review, at the instance of a private owner of the banks of the stream, of a determination of Congress that such flow is needed for the improvement of navigation.

One placing obstructions in a navigable stream under a revocable permit of the Secretary of War does not acquire any right to maintain the same longer than the Government continues the license; and an act of Congress revoking the permit does not amount to a taking of private property so far as exclusion from what was covered by the permit is concerned.

Private ownership of running water in a great navigable stream is inconceivable.

Every structure in the water of a navigable river is subordinate to the right of navigation and must be removed, even if the owners sustain a loss thereby, if Congress, in assertion of its power over navigation so determines.

The act of Congress of March 3, 1909, declaring that a public necessity existed for absolute control of all the water of St. Marys River excludes forever all structures necessary for commercial use of the water power, regardless of whether there may be any surplus in the flow beyond that required for purposes of navigation.

Even if the act declaring that the entire flow of a navigable stream is necessary for navigation provides for the sale of surplus power, the act is still a taking for the purposes of navigation and not for a commercial use.

If the primary object is a legitimate taking there is no objection to the usual disposition of what may be a possible surplus of power. *Kaukauna Co.* v. *Green Bay Canal*, 142 U. S. 254.

An objection to selling excess water power resulting from construction of works for the improvement of navigation cannot be made by one who has no property right in the water which has been taken.

An owner of upland bordering on a navigable river which is taken under condemnation by the Government for the purpose of improving navigation is entitled to compensation for the fair value of the property, but not to any additional values based upon private interest in the potential water power of the river.

The Fifth Amendment is satisfied by payment to the owner of what he actually loses; it does not demand what the taker has gained. *Chamber of Commerce* v. *Boston*, 217 U. S. 189.

One whose property is taken by the Government for improvement of the navigation of the river on which it borders is not entitled to the probably advanced value by reason of the contemplated improvement. The value is to be fixed as of the date of the proceedings.

One whose land is taken by the Government for a particular purpose is entitled to have the fact that the land is peculiarly available for such purpose considered in the appraisal. *Boom Co.* v. *Patterson*, 98 U. S. 403.

Where a survey of a town site has not been carried out the title of the streets does not pass out of the United States and the value of the street cannot be added to that of the abutting property in condemnation proceedings at the instance of the United States.

The owner of a separate parcel is not entitled to additional value resulting as part of a comprehensive scheme of improvement, requiring the taking of his and other property. *Chamber of Commerce* v. *Boston*, 217 U. S. 189.

"Strategic value" cannot be allowed in condemnation proceedings; the value of the property to the Government for a particular use is not the criterion. The owner is compensated when he is allowed full market value.

Where the state of the title and pending litigation affecting it is set up in the pleadings, the fact that the Government seeks condemnation of the property does not amount to conceding that the title is in the party claiming it and against whom the proceeding is directed. In this case all rights were reserved.

THESE writs of error are for the purpose of reviewing a judgment in a condemnation proceeding instituted by the United States under the eleventh section of an act of

Congress of March 3, 1909, 35 Stat., pp. 815, 820, c. 264. The section referred to is set out in the margin.[1]

The notice of condemnation required by the statute was duly given by the Secretary of War and this pro-

---

[1] SEC. 11. That the ownership in fee simple absolute by the United States of all lands and property of every kind and description north of the present Saint Marys Falls Ship Canal throughout its entire length and lying between said ship canal and the international boundary line at Sault Sainte Marie, in the State of Michigan, is necessary for the purposes of navigation of said waters and the waters connected therewith.

The Secretary of War is hereby directed to take proceedings immediately for the acquisition by condemnation or otherwise of all of said lands and property of every kind and description, in fee simple absolute. He shall proceed in such taking by filing in the office of the register of deeds of Chippewa County, in the State of Michigan, a writing, stating the purpose for which the same is taken under the provisions of this section, and giving a full description of all the lands and property of every kind and description thus to be taken. After the filing of said writing, and ten days after publication thereof in one or more newspapers in the city of Sault Sainte Marie, in the State of Michigan, the United States shall be entitled to, and shall take, immediate possession of the property described, and may at once proceed with such public works thereon as have been authorized by Congress for the uses of navigation.

The Circuit Court of the United States for the western district of Michigan is hereby given exclusive jurisdiction to hear condemnation proceedings and to determine what compensation shall be awarded for property taken under authority of this section. After the taking of any property by the Government of the United States, as herein provided for, the United States, by its proper officials, shall begin condemnation proceedings in the aforesaid court, and the practice shall be in accordance with the practice in the courts of the State of Michigan for the condemnation of lands by the State for public buildings of such State so far as the same may be followed without conflicting with the provisions hereof. Possession may be taken by the United States prior to a determination by a court of any necessity of taking, and prior to any determination of the amount of compensation.

Any money payable by the Government under the provisions of this section shall be payable out of any money heretofore authorized or appropriated for the purpose of improving Saint Marys River at the falls, Michigan.

ceeding was instituted against all the corporations and persons supposed to have any interest in the property sought to be condemned.   A jury was waived and the

All that part of "An Act making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes," approved March second, nineteen hundred and seven, beginning with the words "and all lands and waters north of the present Saint Marys Falls ship canal throughout its length," and ending with the words "to comply with the provisions of the river and harbor Act of nineteen hundred and two, but such lands, if so acquired, shall be obtained without expense to the United States," is hereby repealed.

Every permit, license, or authority of every kind, nature, and description, heretofore issued or granted by the United States, or any official thereof, to the Chandler-Dunbar Water Power Company, the Edison Sault Light and Power Company, the Edison Sault Electric Company, or the Saint Marys Power Company, shall cease and determine and become null and void on January first, nineteen hundred and eleven, and the Secretary of War is hereby authorized and instructed to revoke, cancel, and annul every such permit, license or authority, to take effect on January first, nineteen hundred and eleven.

The Secretary of War may, in his discretion, permit the Chandler-Dunbar Water Power Company and the Edison Sault Electric Company to maintain their present works and utilize the water power in said river at said rapids, in so far as the same does not interfere with navigation, or retard the construction of government works in said river, under such rules or regulations as have been or hereafter shall be imposed by the Secretary of War, until they shall be paid the compensation awarded by the court for their property condemned under the provisions of this section; but said permit shall not extend beyond January first, nineteen hundred and eleven.

The President of the United States is respectfully requested to open negotiations with the Government of Great Britain for the purpose of effectually providing, by suitable treaty with said Government, for maintaining ample water levels for the uses of navigation in the Great Lakes and the waters connected therewith, by the construction of such controlling and remedial works in the connecting rivers and channels of such lakes as may be agreed upon by the said governments under the provisions of said treaty.

The Secretary, of War is further authorized and instructed to cause to be made a preliminary examination and survey to ascertain and

evidence submitted to the court, which, at the request of all the parties, made specific findings of fact and law.

By an agreement, the property of the International Bridge Company required by the Government was acquired by deed, and later in the progress of the case the property of the Edison-Sault Electric Company involved in the proceeding was acquired by stipulation. This eliminates from the cases every question except those arising in respect of the compensation to be awarded to the Chandler-Dunbar Water Power Company, the St. Marys Power Company and Clarence M. Brown, Receiver of the Michigan Lake Superior Power Company. The final judgment of the court was:

1. That the ownership in fee simple absolute by the United States of all lands and property of every kind and description north of the present St. Marys Falls Ship Canal, throughout its entire length and lying between the said ship canal and the international line at Sault St. Marie, in the State of Michigan, was necessary for the purposes of navigation of said waters and the waters connected therewith as declared by the act of March 3, 1909.

The compensation awarded was as follows:

a. To the Chandler-Dunbar Company, $652,332. Of this $550,000 was the estimated value of the water power.

b. To the St. Marys Falls Power Company, $21,000.

c. To the Edison-Sault Electric Company, $300,000, which has, however; been settled by stipulation.

d. To the Michigan Lake Superior Power Co., nothing.

From these awards the Government, the Chandler-Dunbar Company, the St. Marys Falls Power Company, and the Michigan Lake Superior Power Company, have sued out writs of error.

determine a proper plan and the probable expense for constructing in the rapids of the Saint Marys River a filling basin or forebay, from which the ship locks shall be filled: Provided, That such survey shall in no way delay or interfere with the plans for construction already under way.

The errors assigned by the United States challenge the allowance of any compensation whatever on account of any water power right claimed by any of the owners of the condemned upland, and also the principles adopted by the District Court for the valuation of the upland taken. The several corporations, who have sued out writs of error, complain of the inadequacy of the award on account of water power claimed to have been taken, and also of the valuation placed upon the several parcels of upland condemned.

The errors assigned by the United States deny that any water power in which the defendants below had any private property right has been taken, and also deny the claim that riparian owners must be compensated for exclusion from the use of the water power inherent in the falls and rapids of the St. Marys River, whether the flow of the river be larger than the needs of navigation or not. The award of $550,000 on account of the claim of the Chandler-Dunbar Company to the undeveloped water power of the river at the St. Marys rapids in excess of the supposed requirements of navigation constitutes the prime question in the case, and its importance is increased by the contention of that company that the assessment of damages on that account is grossly inadequate and should have been $3,450,000.

Each of the several plaintiffs in error also challenge the awards made on account of the several parcels of upland taken,—the Government insisting that the awards are excessive, and the owners, that they are inadequate.

*Mr. Assistant Attorney General Fowler,* with whom *Mr. Reeves T. Strickland* was on the brief, for the United States.[1]

*Mr. William L. Carpenter* for St. Marys Power Company, plaintiff in error in No. 785, submitted.[1]

[1] See note on next page.

*Mr. Moses Hooper,* with whom *Mr. John H. Goff* and *Mr. A. B. Eldredge* were on the brief, for Chandler-Dunbar Water Power Company, defendant in error in No. 783 and plaintiff in error in No. 784.[1]

MR. JUSTICE LURTON, after making the foregoing statement, delivered the opinion of the court.

From the foregoing it will be seen that the controlling questions are, first, whether the Chandler-Dunbar Company has any private property in the water power capacity of the rapids and falls of the St. Marys River which has been "taken," and for which compensation must be made under the Fifth Amendment to the Constitution; and, second, if so, what is the extent of its water power right and how shall the compensation be measured?.

That compensation must be made for the upland taken is not disputable. The measure of compensation may in a degree turn upon the relation of that species of property to the alleged water power rights claimed by the Chandler-Dunbar Company. We, therefore, pass for the present the errors assigned which concern the awards made for such upland.

The technical title to the beds of the navigable rivers of the United States is either in the States in which the rivers are situated, or in the owners of the land bordering upon such rivers. Whether in one or the other is a question of local law. *Shively* v. *Bowlby,* 152 U. S. 1, 31; *Philadelphia Company* v. *Stimson,* 223 U. S. 605, 624, 632; *Scott* v. *Lattig,* 227 U. S. 229. Upon the admission of the State of Michigan into the Union the bed of the St. Marys River passed to the State, and under the law

---

[1] The briefs in this case were very elaborate and exhaustive, several hundred authorities bearing on the issues involved are collated and reviewed. This renders it impossible to make abstracts of them.

of that State the conveyance of a tract of land upon a navigable river carries the title to the middle thread. *Webber* v. *The Pere Marquette &c.*, 62 Michigan, 626; *Scranton* v. *Wheeler*, 179 U. S. 141, 163; *United States* v. *Chandler-Dunbar Water Power Co.*, 209 U. S. 447.

The technical title of the Chandler-Dunbar Company therefore, includes the bed of the river opposite its upland on the bank to the middle thread of the stream, being the boundary line at that point between the United States and the Dominion of Canada. Over this bed flows about two-thirds of the volume of water constituting the falls and rapids of the St. Marys River. By reason of that fact, and the ownership of the shore, the company's claim is, that it is the owner of the river and of the inherent power in the falls and rapids, subject only to the public right of navigation. While not denying that this right of navigation is the dominating right, yet the claim is that the United States in the exercise of the power to regulate commerce, may not exclude the rights of riparian owners to construct in the river and upon their own submerged lands such appliances as are necessary to control and use the current for commercial purposes, provided only that such structures do not impede or hinder navigation and that the flow of the stream is not so diminished as to leave less than every possible requirement of navigation, present and future. This claim of a proprietary right in the bed of the river and in the flow of the stream over that bed to the extent that such flow is in excess of the wants of navigation constitutes the ground upon which the company asserts that a necessary effect of the act of March 3, 1909, and of the judgment of condemnation in the court below, is a taking from it of a property right or interest of great value, for which, under the Fifth Amendment, compensation must be made.

This is the view which was entertained by Circuit Judge Denison in the court below, and is supported by most

careful findings of fact and law and an elaborate and able opinion. The question is, therefore, one which from every standpoint deserves careful consideration.

This title of the owner of fast land upon the shore of a navigable river to the bed of the river, is at best a qualified one. It is a title which inheres in the ownership of the shore and, unless reserved or excluded by implication, passed with it as a shadow follows a substance, although capable of distinct ownership. It is subordinate to the public right of navigation, and however helpful in protecting the owner against the acts of third parties, is of no avail against the exercise of the great and absolute power of Congress over the improvement of navigable rivers. That power of use and control comes from the power to regulate commerce between the States and with foreign nations. It includes navigation and subjects every navigable river to the control of Congress. All means having some positive relation to the end in view which are not forbidden by some other provision of the Constitution, are admissible. If, in the judgment of Congress, the use of the bottom of the river is proper for the purpose of placing therein structures in aid of navigation, it is not thereby taking private property for a public use, for the owner's title was in its very nature subject to that use in the interest of public navigation. If its judgment be that structures placed in the river and upon such submerged land, are an obstruction or hindrance to the proper use of the river for purposes of navigation, it may require their removal and forbid the use of the bed of the river by the owner in any way which in its judgment is injurious to the dominant right of navigation. So, also, it may permit the construction and maintenance of tunnels under or bridges over the river, and may require the removal of every such structure placed there with or without its license, the element of contract out of the way, which it shall require to be re-

moved or altered as an obstruction to navigation.   In *Gilman* v. *Philadelphia*, 3 Wall. 713, 724, this court said:

"Commerce includes navigation.   The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters, of the United States which are accessible from a State other than those in which they lie.   For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.   This necessarily includes the power to keep them open and free from any obstructions to their navigation, interposed by the States or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of the evil and for the punishment of offenders.   For these purposes, Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England.

"It is for Congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided."

In *Gibson* v. *United States*, 166 U. S. 269, it is said (p. 271):

"All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various States and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal Government by the Constitution."

Thus in *Scranton* v. *Wheeler, supra,* the Government constructed a long dyke or pier upon such submerged lands in the river here involved, for the purpose of aiding its navigation.   This cut the riparian owner off from direct access to deep water, and he claimed that his rights had

been invaded and his property taken without compensation. This court held that the Government had not "taken" any property which was not primarily subject to the very use to which it had been put, and, therefore, denied his claim. Touching the nature and character of a riparian owner in the submerged lands in front of his upland bounding upon a public navigable river such as the St. Marys, this court said (p. 163):

"The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bounding on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such waters. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation."

So unfettered is this control of Congress over the navigable streams of the country that its judgment as to whether a construction in or over such a river is or is not an obstacle and a hindrance to navigation, is conclusive. Such judgment and determination is the exercise of legislative power in respect of a subject wholly within its control.

In *Pennsylvania* v. *Wheeling Bridge Company*, 18 How. 421, 430, this court, upon the facts in evidence, held that a bridge over the Ohio River, constructed under an act of the State of Virginia, created an obstruction to navigation, and was a nuisance which should be removed. Before the decree was executed Congress declared the bridge a lawful structure and not an obstruction. This court there-

upon refused to issue a mandate for carrying into effect its own decree, saying:

"Although it still may be an obstruction in fact, it is not so in the contemplation of law. We have already said, and the principle is undoubted, that the act of the legislature of Virginia conferred full authority to erect and maintain the bridge, subject to the exercise of the power of Congress to regulate the navigation of the river. That body having in the exercise of this power, regulated the navigation consistent with its preservation and continuation, the authority to maintain it would seem to be complete. That authority combines the concurrent powers of both governments, State and Federal, which, if not sufficient, certainly none can be found in our system of government."

In *Philadelphia* v. *Stimson, supra,* and in *Union Bridge Company* v. *United States,* 204 U. S. 364, many of the cases are cited and reviewed and we need add nothing more to the discussion.

The conclusion to be drawn is, that the question of whether the proper regulation of navigation of this river at the place in question required that no construction of any kind should be placed or continued in the river by riparian owners, and whether the whole flow of the stream should be conserved for the use and safety of navigation, are questions legislative in character; and when Congress determined, as it did by the act of March 3, 1909, that the whole river between the American bank and the international line, as well as all of the upland north of the present ship canal, throughout its entire length, was "necessary for the purposes of navigation of said waters and the waters connected therewith," that determination was conclusive.

So much of the zone covered by this declaration as consisted of fast land upon the banks of the river, or in islands which were private property, is, of course, to be paid for.

But the flow of the stream was in no sense private prop-
erty, and there is no room for a judicial review of the
judgment of Congress that the flow of the river is not in
excess of any possible need of navigation, or for a determin-
ation that if in excess, the riparian owners had any private
property right in such excess which must be paid for if
they have been excluded from the use of the same.

That Congress did not act arbitrarily in determining
that "for the purposes of navigation of said waters and
the waters connected therewith," the whole flow of the
stream should be devoted exclusively to that end, is most
evident when we consider the character of this stream and
its relation to the whole problem of lake navigation. The
river St. Marys is the only outlet for the waters of Lake
Superior. The stretch of water called the falls and rapids
of the river is about 3,000 feet long and from bank to
bank has a width of about 4,000 feet. About two-thirds
of the volume of the stream flows over the submerged
lands of the Chandler-Dunbar Company, the rest over
like lands on the Canadian side of the boundary. The fall
in the rapids is about 18 feet. This turbulent water,
substantially unnavigable without the artificial aid of
canals around the stream, constitutes both a tremendous
obstacle to navigation and an equally great source of
water power, if devoted to commercial purposes. That
the wider needs of navigation might not be hindered by
the presence in the river of the construction works neces-
sary to use it for the development of water power for com-
mercial uses under private ownership was the judgment
and determination of Congress. There was also present
in the mind of Congress the necessity of controlling the
outflow from Lake Superior, which averages some 64,000
cubic feet per second. That outflow has great influence
both upon the water level of Lake Superior and also upon
the level of the great system of lakes below, which receive
that outflow. A difference of a foot in the level of Lake

Superior may influence adversely access to the harbors on that lake.  The same fall in the water level of the lower lakes will perceptibly affect access to their ports.  This was a matter of international consideration, for Canada, as well as the United States, was interested in the control and regulation of the lake water levels.  And so we find in the act of 1909 a request that the President of the United States will open negotiations with the Government of Great Britain, "for the purpose of effectually providing, by suitable treaty, for maintaining ample water levels. for the uses of navigation in the Great Lakes and the waters connected therewith, by the construction of such controlling and remedial works in the connecting rivers and channels of such lakes as may be agreed upon by the said governments under the provisions of said treaty."

The falls and rapids are at the exit of the river from the lake.  Millions of public money have already been expended in the construction of canals and locks, by this government upon the American side, and by the Canadian Government upon its own side of the rapids, as a means by which water craft may pass around the falls and rapids in the river.  The commerce using these facilities has increased by leaps and bounds.  The first canal had hardly been finished before it became inadequate. A second upon the American side was constructed parallel with the first.  The two together are insufficient, though the canal upon the Canadian side accommodates much of the commerce.  The main purpose of the act of 1909 was to clear the way for generally widening and enlarging facilities for the ever growing commerce of the Great Lakes.  The act, therefore, looks to the construction of one or more canals and locks, paralleling those in use, and directs a survey "to ascertain and determine the proper plan, . . . for constructing in the rapids . . . a filling basin or forebay from which the ship locks may be filled."

The upland belonging to the Chandler-Dunbar Company consists of a strip of land some 2,500 feet long and from 50 to 150 feet wide. It borders upon the river on one side, and on the Government canal strip on the other. Under permits from the Secretary of War, revocable at will, it placed in the rapids, in connection with its upland facilities, the necessary dams, dykes and forebays for the purpose of controlling the current 'and using its power for commercial purposes, and has been for some years engaged in using and selling water power. What it did was by the revocable permission of the Secretary of War, and every such permit or license was revoked by the act of 1909. (See act of September 19, 1890, 26 Stat., pp. 426, 454, c. 907, forbidding the construction of any dam, pier or breakwater in any navigable river without permission of the Secretary of War, or the creation of any obstruction not affirmatively authorized by law, "to the navigable capacity of such rivers." See also the later act of March 3, 1899, 30 Stat., pp. 1151, 1155, c. 425, and *United States* v. *Rio Grande Irrigation Company*, 174 U. S. 690, construing and applying the act of 1890). That it did not thereby acquire any right to maintain these constructions in the river longer than the Government should continue the license, needs no argument. They were placed in the river under a permit which the company knew was likely to be revoked at any time. There is nothing in the facts which savors of estoppel in law or equity. The suggestion by counsel that the act of 1909 contemplates that the owner should be compensated not only for its tangible property, movable or real, but for its loss and damage by the discontinuance of the company's license and its exclusion from the right to use the water power inherent in the falls and rapids, for commercial purposes, is without merit. The provisions of the act in respect of compensation apply only to compensation for such "property described" as shall be held private property taken for

public uses. . Unless, therefore, the water power rights asserted by the Chandler-Dunbar Company are determined to be private property the court below was not authorized to award compensation for such rights.

It is a little difficult to understand the basis for the claim that in appropriating the upland bordering upon this stretch of water, the Government not only takes the land but also the great water power which potentially exists in the river. The broad claim that the water power of the stream is appurtenant to the bank owned by it, and not dependent upon ownership of the soil over which the river flows has been advanced. But whether this private right to the use of the flow of the water and flow of the stream be based upon the qualified title which the company had to the bed of the river over which it flows or the ownership of land bordering upon the river, is of no prime importance. In neither event can there be said to arise any ownership of the river. Ownership of a private stream wholly upon the lands of an individual is conceivable; but that the running water in a great navigable stream is capable of private ownership is inconceivable.

Whatever substantial private property rights exist in the flow of the stream must come from some right which that company has to construct and maintain such works in the river, such as dams, walls, dykes, etc., essential to the utilization of the power of the stream for commercial purposes. We may put out of view altogether the class of cases which deal with the right of riparian owners upon a non-navigable stream to the use and enjoyment of the stream and its waters. The use of the fall of such a stream for the production of power may be a reasonable use consistent with the rights of those above and below. The necessary dam to use the power might completely obstruct the stream, but if the effect was not injurious to the property of those above or to the equal rights of those

below, none could complain, since no public interest would
be affected. We may also lay out of consideration the
cases cited which deal with the rights of riparian owners
upon navigable or non-navigable streams as between each
other. Nor need we consider cases cited which deal with
the rights of riparian owners under state laws and private
or public charters conferring rights. That riparian owners
upon public navigable rivers have in addition to the rights
common to the public certain rights to the use and enjoy-
ment of the stream which are incident to such ownership
of the bank, must be conceded. These additional rights
are not dependent upon title to the soil over which the
river flows, but are incident to ownership upon the bank.
Among these rights of use and enjoyment is the right, as
against other riparian owners, to have the stream come
to them substantially in its natural state, both in quantity
and quality. They have also the right of access to deep
water, and when not forbidden by public law may con-
struct for this purpose, wharves, docks, and piers in the
shallow water of the shore. But every such structure in
the water of a navigable river is subordinate to the right
of navigation, and subject to the obligation to suffer the
consequences of the improvement of navigation, and must
be removed if Congress in the assertion of its power over
navigation shall determine that their continuance is det-
rimental to the public interest in the navigation of the
river. *Gibson* v. *United States*, 166 U. S. 269; *Transporta-
tion Co.* v. *Chicago*, 99 U. S. 635. It is for Congress to
decide what is and what is not an obstruction to navi-
gation; *Pennsylvania* v. *Wheeling Bridge Co.*, 18 How. 421;
*Union Bridge Co.* v. *United States*, 204 U. S. 364; *Phila-
delphia Co.* v. *Stimson*, 223 U. S. 605.

To utilize the rapids and fall of the river which flows
by the upland of the Chandler-Dunbar Company, it has
been and will be necessary to construct and maintain in
the river the structures necessary to control and direct

the flow so that it may be used for commercial purposes. The thirty-fourth finding of fact includes this:

"For about twenty years the Chandler-Dunbar Company, or its predecessors or someone claiming under it, has been developing power at this part of the rapids. This was accomplished by a short transverse dam near the lower boundary of its land extending out a short distance into the stream and then extending up along the bed of the stream (substantially) parallel to the bank up to the head of the rapids. This dam or wall toward its upper end diverged out into the stream the better to divert water into the headrace and into the forebay formed by its lower part. Earlier structures of this character were replaced about 1901 by those more extensive ones which existed when this condemnation was made. While considerable in extent and cost, they are inconsiderable as compared with the structures now proposed to utilize the whole power, and they were, comparatively speaking, along the bank rather than across the stream."

The seventy-first finding of fact was in these words:

"All the development works ever constructed upon the Chandler-Dunbar submerged lands by anyone, have been constructed after obtaining from the Secretary of War a permit therefor, and each such permit has been expressly revocable by right of revocation reserved on its face, to be exercised with or without cause. Each such permit was revoked before the commencement of this proceeding."

Upon what principle can it be said that in requiring the removal of the development works which were in the river upon sufferance, Congress has taken private property for public use without compensation? In deciding that a necessity existed for absolute control of the river at the rapids, Congress has of course excluded, until it changes the law, every such construction as a hindrance to its plans and purposes for the betterment of naviga-

tion. The qualified title to the bed of the river affords no ground for any claim of a right to construct and maintain therein any structure which Congress has by the act of 1909 decided in effect to be an obstruction to navigation, and a hindrance to its plans for improvement. That title is absolutely subordinate to the right of navigation and no right of private property would have been invaded if such submerged lands were occupied by structures in aid of navigation or kept free from such obstructions in the interest of navigation. *Scranton* v. *Wheeler, supra; Hawkins Light House Case,* 39 Fed. Rep. 77, 83. We need not consider whether the entire flow of the river is necessary for the purposes of navigation, or whether there is a surplus which is to be paid for, if the Chandler-Dunbar Company is to be excluded from the commercial use of that surplus. The answer is found in the fact that Congress has determined that the stream from the upland taken to the international boundary is necessary for the purposes of navigation. That determination operates to exclude from the river forever the structures necessary for the commercial use of the water power. That it does not deprive the Chandler-Dunbar Company of private property rights follows from the considerations before stated.

It is said that the twelfth section of the act of 1909 authorizes the Secretary of War to lease upon terms agreed upon, any excess of water power which results from the conservation of the flow of the river, and the works which the Government may construct. This it is said is a taking of private property for commercial uses and not for the improvement of navigation. But aside from the exclusive public purpose declared by the eleventh section of the act, the twelfth section declares that the conservation of the flow of the river is "primarily for the benefit of navigation, and incidentally for the purpose of having the water power developed, either for the direct

use of the United States, or by lease . . . through the Secretary of War." If the primary purpose is legitimate, we can see no sound objection to leasing any excess of power over the needs of the Government. The practice is not unusual in respect to similar public works constructed by state governments. In *Kaukauna Co.* v. *Green Bay &c. Canal*, 142 U. S. 254, 273, respecting a Wisconsin act to which this objection was made, the court said:

"But, if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the State may not retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement. Indeed, it might become very necessary to retain the disposition of it in its own hands, in order to preserve at all times a sufficient supply for the purposes of navigation. If the riparian owners were allowed to tap the pond at different places, and draw off the water for their own use, serious consequences might arise, not only in connection with the public demand for the purposes of navigation, but between the riparian owners themselves as to the proper proportion each was entitled to draw—controversies which could only be avoided by the State reserving to itself the immediate supervision of the entire supply. As there is no need of the surplus running to waste, there was nothing objectionable in permitting the State to let out the use of it to private parties, and thus reimburse itself for the expenses of the improvement."

It is at best not clear how the Chandler-Dunbar Company can be heard to object to the selling of any excess of water power which may result from the construction of such controlling or remedial works as shall be found advisable for the improvement of navigation, inasmuch as

it had no property right in the river which has been "taken." It has, therefore, no interest whether the Government permit the excess of power to go to waste or made the means of producing some return upon the great expenditure.

The conclusion therefore is that the court below erred in awarding $550,000, or any other sum for the value of what is called "raw water," that is the present money value of the rapids and falls to the Chandler-Dunbar Company as riparian owners of the shore and appurtenant submerged land.

Coming now to the award for the upland taken:

The court below awarded to the Chandler-Dunbar Company on this account—

a. For the narrow strip of upland bordering on the river, having an area of something more than 8 acres, excluding the small parcels described in the pleadings and judgment as claims 95 and 96, $65,000, less 7% of that sum on account of Portage Street, which the court later found belonged to the United States and not to that company ........................................ $60,450

b. For the small parcels covered by claims 95 and 96................................. 25,000

c. For a half interest in lot on bridge property. 338

These awards include certain sums for special values: The value of the upland strip fixed at $60,450 was arrived at in this manner—

a. For its value, including railroad side tracks, buildings and cable terminal, including also its use, "wholly disconnected with power development or public improvement, that is to say, for all general purposes, like residences, or hotels, factory sites, disconnected with water power etc., $20,000."

b. "For use as factory site in connection with the development of 6,500 horse power, either as a single site or for several factories to use the surplus of 6,500 horse

power not now used in the .city, an additional value of $20,000.

c. For use for canal and lock purposes, an additional value of $25,000.

The small parcels constituting claims 95 and 96 were valued at $25,000.

These two parcels seem to have been connected by a costly fill. They fronted upon deep water above the head of the rapids. They had therefore a special value for wharfs, docks, etc., and had been so used. The gross sum awarded included the following elements:

a. For general wharfage, dock and warehouse purposes, disconnected with development of power in the rapids, $10,000.

b. For its special value for canal and lock purposes an additional sum of $10,000.

c. In connection with the canal along the rapids, if used as a part of the development of 4,500 (6,500) horse power, an additional value of $5,000.

The United States excepted to the additional value allowed in consequence of the availability of these parcels in connection with the water power supposed to be the property of the Chandler-Dunbar Company, and supposed to have been taken by the Government in this case. It also excepted to so much of the awards as constituted an additional value by reason of availability for lock and canal purposes.

These exceptions so far as they complain of the additional value to be attached to these parcels for use as factory sites in connection with the development of horse power by the Chandler-Dunbar Company, must be sustained. These "additional" values were based upon the erroneous hypothesis that that company had a private property interest in the water power of the river, not possibly needed now or in the future for purposes of navigation, and that that excess or surplus water was capable,

by some extension of their works already in the river, of producing 6,500 horse power.

Having decided that the Chandler-Dunbar Company as riparian owners had no such vested property right in the water power inherent in the falls and rapids of the river, and no right to place in the river the works essential to any practical use of the flow of the river, the Government cannot be justly required to pay for an element of value which did not inhere in these parcels as upland. The Government had dominion over the water power of the rapids and falls and cannot be required to pay any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use. These additional values represent, therefore, no actual loss and there would be no justice in paying for a loss suffered by no one in fact. "The requirement of the Fifth Amendment is satisfied when the owner is paid for what is taken from him. The question is what has the owner lost, and not what has the taker gained." *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 194, 195.

Neither can consideration be given to probable advancement in the value of such riparian property by reason of the works to be constructed in the river by the Government, or the use to which the flow of the stream might be directed by the Government. The value should be fixed as of the date of the proceedings and with reference to the loss the owner sustains, considering the property in its condition and situation at the time it is taken and not as enhanced by the purpose for which it was taken. *Kerr* v. *Park Commissioners*, 117 U. S. 379, 387; *Shoemaker* v. *United States*, 147 U. S. 282, 304, 305.

The exception taken to the inclusion as an element of value of the availability of these parcels of land for lock and canal purposes must be overruled. That this land had a prospective value for the purpose of constructing

a canal and lock parallel with those in use had passed beyond the region of the purely conjectural or speculative. That one or more additional parallel canals and locks would be needed to meet the increasing demands of lake traffic was an immediate probability. This land was the only land available for the purpose. It included all the land between the canals in use and the bank of the river. Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose. Lewis on Eminent Domain, § 707. *Boom Co.* v. *Patterson,* 98 U. S. 403, 408; *Shoemaker* v. *United States,* 147 U. S. 282; *Young* v. *Harrison,* 17 Georgia, 30; *Alloway* v. *Nashville,* 88 Tennessee, 510; *Sargent* v. *Merrimac,* 196 Massachusetts, 171. *Boom Company* v. *Patterson* was this: A boom company sought to condemn three small islands in the Mississippi river so situated with reference to each other and the river bank as to be peculiarly adapted to form a boom a mile in length. The question in the case was whether their adaptability for that purpose gave the property a special value which might be considered. This court held that the adaptability of the land for the purposes of a boom was an element which should be considered in estimating the value of the lands condemned. The court said, touching the rule for estimating damages in such cases:

"So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community,

or such as may be reasonably expected in the immediate future."

In *Shoemaker* v. *United States, supra,* lands were condemned for park purposes. In the court below the commissioners were instructed to estimate each piece of land at its market value and that, "the market value of the land includes its value for any use to which it may be put, and all the uses to which it is adapted, and not merely the condition in which it is at the present time, and the use to which it is now applied by the owner; . . . that if, by reason of its location, its surroundings, its natural advantages, its artificial improvement or its intrinsic character, it is peculiarly adapted to some particular use—e. g., to the use of a public park—all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating the compensation." The court approved this instruction.

The Chandler-Dunbar Company has also assigned as error the denial of any award on account of a portion of Portage Street to which it claimed title. The title to that parcel has never passed out of the United States. It was part of a street laid off by a survey made of the village of Sault Sainte Marie, a town which had grown up on public land of the United States. But that survey was never carried into a patent and the village never accepted this part of the street. Thus abandoned, it was occupied for a time by the Chandler-Dunbar Company, but not long enough to acquire title. The court did not err in holding that the company had acquired no title, and that title was already in the United States.

The award to the St. Marys Power Company, as owner of island No. 5 is excepted to. The value of that island was fixed at $21,000. That amount was reached, as shown by the 70th finding of fact, in this manner:

a. As a base value, for general purposes, as for
    a cottage or fishing station. . . . . . '. . . . .  $1,000
b. As a strategic value, growing out of the ex-
    tent to which it may control or block
    the most available development by up
    stream owners. . . . . . . . . . . . . . . . . . . . .  $15,000
c. As an additional value, by reason of its
    special suitability for lock or canal pur-
    poses". . . . . . . . . . . . . . . . . . . . . . . . . . .  $5,000

This island No. 5, otherwise known as Oshawano
Island, is on the American edge of the rapids and below
the Chandler-Dunbar property, and opposite that part
of the shore belonging to the United States.  It has an
area of about one-third of an acre.  The court found that
it had no appreciable water power which was in any sense
appurtenant, and so no allowance was made on that
account.  Because none was made the St. Marys Power
Company sued out a writ of error.  The reasons which
have induced us to deny such an allowance in respect of
upland upon the bank of the river, require the assignment
referred to to be held bad.  The court below held, how-
ever, that the island had value in other ways, being those
mentioned above.  In respect to the allowance of $15,000
as its "strategic value," the court below in its opinion
said: .

"Owing to its location, this property has, and always
has had, a strategic value with reference to any general
scheme of water development in the river and because it
must be included as a tail race site, if not otherwise, in
any completely efficient plan of development by any
owner, private or public.  This value is denied, because
it is, as Government counsel say, of the 'hold up' charac-
ter.  It should not be permitted to assume the latter
character, nor should the fair strategic value be denied
because there might be an attempt at exaggeration or
abuse.  I fix this so-called strategic value at $10,000

(afterwards raised to $15,000), and it should be awarded under the circumstances of this case to whomsoever the owner may be."

This allowance has no solid basis upon which it may stand. That the property may have to the public a greater value than its fair market value affords no just criterion for estimating what the owner should receive. It is not proper to attribute to it any part of the value which might result from a consideration of its value as a necessary part of a comprehensive system of river improvement which should include the river and the upland upon the shore adjacent. The ownership is not the same. The principle applied in *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, is applicable. In that case it appeared that one person owned the land condemned subject to servitudes to others. It was sought to have damages assessed upon a bill in which all of the interests joined for the purpose of having a lump sum awarded to be divided as the parties might or had agreed. If this could be done it was agreed that the estate, considered as the sole unencumbered estate of a single person, was worth many times more than if the damage should be assessed according to the condition of the title at the time. This court held that the requirement of compensation when land is taken for a public purpose "does not require a disregard of the mode of ownership. It does not require a parcel of land to be valued as an unencumbered whole."

The "Strategic Value" for which $15,000 has been allowed is altogether speculative. It is based not upon the actual market value for all reasonable uses and demands, but the possible worth of the property to the Government.

A "strategic value" might be realized by a price fixed by the necessities of one person buying from another, free to sell or refuse as the price suited. But in a condemna-

tion proceeding, the value of the property to the Government for its particular use is not a criterion. The owner must be compensated for what is taken from him, but that is done when he is paid its fair market value for all available uses and purposes. Lewis Eminent Domain, 3d ed., § 706; *Moulton* v. *Newburyport Water Co.*, 137 Massachusetts, 163, 167; *United States* v. *Seufert Bros. Co.*, 78 Fed. Rep. 520; *Alloway* v. *Nashville*, 88 Tennessee, 510, 514; *United States* v. *Honolulu Co.*, 122 Fed. Rep. 581.

The exception must be sustained.

One other assignment by the St. Marys Power Company needs to be specially noticed. The title to Oshawano Island is in ligitation between the United States and the St. Marys Power Company. For this reason the award to that company was ordered to remain in the registry of the court until that litigation was ended. The St. Marys Power Company contends that when the United States sought the condemnation of the property in this proceeding it thereby conceded the title to be in it. But the pleadings show that no such concession was made. The state of the title and of the pending litigation was set up and we think all rights were thereby reserved.

The assignments of error by the Michigan Lake Superior Power Company must be overruled. No property, real or hypothetical, has been taken from it.

Other assignments of error by one or another of the several plaintiffs in error need not be specially noticed. They are all overruled as either covered by the views we have expressed, or as having no merit.

*The judgment of the court below must be reversed and the cases remanded with direction to enter a judgment in accordance with this opinion.*