UNITED STATES v. 80.46 ACRES IN ERIE COUNTY et al.

Civ. No. 1071.

District Court, W. D. New York.

June 20, 1944.

George L. Grobe, U. S. Atty., of Buffalo, N. Y. (Eugene J. Donnelly, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for petitioner.

Stephen Goldstein, of Buffalo, N. Y. (George C. Riley, of Buffalo, N. Y., of counsel), for defendants Albert C. Phillips and Eugene Phillips.

Ralph A. Lehr, of Buffalo, N. Y., for Erie County.

Maurice J. Rumizen, Asst. Co. Atty., and Philip J. Snyder, both of Buffalo, N. Y., for defendants Guardian ad Litem for Edward Phillips, an infant.

KNIGHT, District Judge.

The individual defendants move to set aside awards made by Commissioners appointed by this Court for damages and compensation for certain premises taken by the petitioner through condemnation proceedings. The petitioner moves for a confirmation of these awards.

The premises described in the Declaration of taking consist of one parcel of land consisting of 75.198 acres, referred to in the proceedings as Tract T–1; one consisting of 3.1774 acres, referred to as Tract T–2; and 2.2548 acres (a 40 foot strip) lying along the westerly side of tracts T–1 and T–2, referred to as Tract T–3. It appeared that title to the last-mentioned parcel was vested in the County of Erie for highway purposes, and it was stipulated that this parcel be omitted from these proceedings and the Declaration of taking amended accordingly.

The Commissioners fixed the amount of damages and just compensation at $97,738.-18 for Tract T–1 to be paid to the defendants, Albert Phillips and Eugene Phillips, as their interests therein appear, and the amount to be paid to the defendants, Edward Phillips, an infant, and others, as their interests appear, for Tract T–2, at $5,626.72.

The said defendants seek to set aside the aforesaid awards both upon the ground that they are inadequate and on the ground that the Commissioners applied improper rules of law in arriving at the amount of such awards.

The rule of law with respect to the right of the Court to change an award of Commissioners, such as in these proceedings, and the basis for such rules are clearly established by many decisions of the courts. The right of the Court to review is very limited. The language of the Supreme Court in Columbia Heights Realty Co. v. Rudolph, 217 U.S. 547, 560, 30 S. Ct. 581, 586, 54 L.Ed. 877, 19 Ann.Cas. 854 (condemnation), is plainly in point here. The court there said: "The power of the court to review the award * * * must, * * *, be limited to plain errors of law, misconduct, or grave error of fact indicating plain partiality or corruption. The jury saw and heard the witnesses; the court did not. The jury went upon and viewed the premises; the court did not. The duty to review did not involve mere error in judgment as to the extent of enhancement in value, for the judgment of the jury manifestly rested upon much which could not be brought before the court. The jury was expected to exercise its own judgment, derived from personal knowledge from a view of the premises, as well as from the opinion evidenced which might be brought before them." Citing Shoemaker v. United States, 147 U. S. 282, 13 S.Ct. 361, 37 L.Ed. 170. Vide also: St. Bernard Cypruse Co. v. United States, 5 Cir., 65 F.2d 711; United States v. Certain Lands in the Town of Highlands, D. C., 36 F.Supp. 971; United States v. Certain Land situate in Wayne Co., State of Mo., D.C., 40 F.Supp. 792; Matter of Corporation Counsel of City of New York, 188 App.Div. 668, 177 N.Y.S. 318; Matter of City of Rochester, Smith St. Bridge, 234 App.Div. 583, 255 N.Y.S. 801, and numerous cases there cited.

In the instant case a very considerable amount of evidence was submitted to the Commissioners. Numerous witnesses testified and comprehensive drawings and other exhibits were introduced in evidence. The Commissioners, as was their right, were liberal in the reception of testimony. They were not bound by strict rules in this respect. Two of the Commissioners were appointed by this Court as being specially qualified because they were real estate dealers. The Commissioners viewed the premises; the court did not. The Commissioners saw and heard the witnesses; the court did neither. Several wit-

nesses were called as experts on land values, and, as often appears, there was wide variance in their estimates, varying from $800 to $1500 per acre, as testified to by petitioner's experts to $2400 to $3500, as testified to by defendants' experts, as to Tract T–1, and from $3602.40 to $9741 as to Tract T–2. The testimony of none of the experts was binding on the Commission. It was advisory. The Commissioners were not restricted to any species of evidence but were entitled to use any information which they acquired, from an inspection of the premises, as well as on the evidence produced on the hearing. United States v. Certain Lands, D. C., 36 F.Supp. 971, supra; United States v. Four Parcels of Land, D.C., 20 F.Supp. 306; Burnett v. Central Nebraska Public Power & Irrigation Dist., 8 Cir., 125 F.2d 836.

This Court has read all of the evidence submitted and examined the various exhibits and maps used in connection therewith. The defendants have submitted well-prepared briefs upon the law and detailing and comparing the proofs with respect to value.

The lands in question are situate on Cayuga Street, in the Town of Cheektowaga, Erie County, New York, and located some two miles distant from the city line of the City of Buffalo, New York. Tract T–2 is within the confines of Tract T–1, and formerly they constituted a single tract.

Commencing in 1925 and down to and including 1929, the City of Buffalo acquired numerous parcels of land, aggregating 540 acres, for a municipal airport, extending from Genesee Street, in Cheektowaga, New York, to and bounded on the west by Tract T–1 and other parcels of land, and on the east by the Curtiss-Wright Corporation plant lands. The airport has been operated continuously since 1926. In or about 1940 the acquisition of the land by or on behalf of the Defense Plant Corporation, a Maryland corporation organized as an aid to the war effort, was begun, for the purpose of leasing it to the Curtiss-Wright Corporation and building a plant for the Curtiss-Wright Corporation, for the manufacture of airplanes. This acquisition was continued down to and including the year 1942. The total acreage so acquired was approximately 294, and all of this, except 28.028 acres (including nine acres owned by Curtiss-Wright Corporation) accumulated as one tract, was north of Genesee Street, Cheektowaga, and immediately adjoining on the east the said Buffalo Municipal Airport. The Buffalo Airport is extensively used, and the large plant of the Curtiss-Wright Corporation engages thousands in employment. The lands so acquired by the Defense Corporation are leased to the Curtiss-Wright Corporation for a number of years with the right of renewal under certain conditions and a conditional option of purchase.

The premises in question here were acquired by the U. S. War Department for the purpose of the erection thereon of a so-called modification building to be used in connection with the Curtiss-Wright Corporation plant. Since the Buffalo Municipal Airport lands lie between the Curtiss-Wright Corporation plant lands and the parcels in question, in order to utilize this so-called modification building, it is necessary for Curtiss-Wright to use runways crossing the Municipal Airport.

Upon the so-called parcel T–1 there were no buildings. It formerly had been used as farm lands in connection with parcel T–2 on which were located a dwelling, barn and other buildings. The evidence discloses that in the assembly of the lands of the Buffalo Municipal Airport, and the Defense Corporation purchased for the use of the Curtiss-Wright Corporation, many different prices were paid, and that there was a great variance in the price on an acre basis. In 1925 and 1926, the city purchased 163 acres at the average cost of $575 per acre and 314 acres at average cost of $958 per acre. The highest purchase paid by the city was $1000 per acre in 1929, and this was for 36.74 acres strategically located for the Airport. The Defense Plant Corporation commencing in 1940 and continuing until 1942 paid the low price of $435 an acre for one parcel to a high of $5,591.59 per acre paid the city for 12.49 acres by the Defense Plant Corporation. From May, 1940, to September, 1940, the purchase prices ran from a low of $415 to $3039 per acre for tracts of considerable acreage. Some reason for the great disparity of these prices can be seen in the particular locations of the various parcels and in the exigencies which necessitated speed in the production of war materials. It appears difficult to reconcile many of the prices paid for land in the different assemblies on the basis of market value. The most plausible explanation for the variances is that the parcels were urgently wanted, and they were bought with-

out regard to the real value to the owner. The criterion is not what the value is to the purchaser, but rather to the seller. Boston Chamber of Commerce v. Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725; Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328.

Unless it is found that the Commissioners should have and did not take into consideration the prices paid for the lands purchased by the Defense Corporation and the Curtiss-Wright Corporation in 1942 or failed to apply the proper rules of law in fixing values, the awards must be affirmed.

The defendants contend that the Commissioners ignored the prices paid for the land purchased by the Defense Corporation and the Curtiss-Wright Corporation in the year 1942. The government has asserted that these purchases were to be considered within the rule making the prices paid within the boundary of an entire development project of the government incompetent in establishing the values of this particular acquisition. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; Re Five Tracts of Land v. United States, 3 Cir., 101 F. 661; Pennsylvania Co. v. United States, 6 Cir., 223 F. 759.

All the purchases in 1942 either by Curtiss or Defense Plant Corporation were south of Genesee Street, save two parcels, one of 4.54 acres conveyed by Kubera to the Defense Corporation and one of 12.49 acres conveyed by the City of Buffalo to the Defense Plant Corporation. However, the Defense Plant Corporation conveyed to the City of Buffalo 1.6 acres off from the aforesaid 4.54 acres. All of the 1942 purchases were in close proximity of the main operating building of the Curtiss-Wright Corporation and on Genesee Street. Genesee Street is a continuation of one of the principal streets in Buffalo, New York. All of the valuation experts in great detail gave testimony regarding the values of the 1942 purchases and the particulars as to the reasonableness of or the reason for the price paid. The Commissioners said: "From the testimony it appears that the prices of the Curtiss Acquisition North of Genesee Street varied from a low of about $435.00 per acre * * * to upwards of $5000.00 per Acre, * * * the adjusted average was testified to be $1811.00 to $1830.00 per Acre. * * * The properties in the Curtiss Acquisition South of Genesee Street comprised three parcels having a combined frontage of about 1790 feet on Genesee Street * * *, which were purchased in 1942, at prices of about $2500.00 per Acre * * *."

The Commissioners further said: "In arriving at the amount of damages * * *, we have considered * * * all of the evidence presented as to the topography and plottage of the premises taken in this proceeding and that of the other property in that vicinity, the proximity of said premises to railroads, the highway which bounds premises on the West and also the utility services, such as light, gas, water and sewer, which were available to premises." and that they determined the damages and compensation to be paid as to each parcel upon the consideration of all "testimony given and adduced and exhibits introduced in evidence with regard thereto during the hearings."

All of the 1942 purchases were made subsequent to the construction of the Curtiss-Wright Corporation's main plant buildings. The two parcels on the north side of Genesee Street were small compared with Tract 1 and were sandwiched in between the Airport and the Curtiss-Wright's main plant plot. They were of additional value to the buyer because they completed the Curtiss-Wright plot on the north side of Genesee Street. The parcels on the south side were immediately across Genesee Street from the Curtiss-Wright's main plant buildings.

The Commissioners might well have found that the prices paid for the 1942 parcels did not represent the fair market values of such parcels and they were justified in disregarding them as a measure of value.

It appears to be undisputed that the lands in question could not profitably be operated as farm lands; that they were not suitable for residential purposes because of their proximity to the Airport; that the market value either for farm uses or residential purposes was much less than the lowest price fixed per acre in any of the testimony. While it is apparent that these lands may have been put to many different uses, its market value for such uses would, as the testimony discloses, have been greatly lessened by the lack of railroad facilities and the difficulty and the expense attendant upon obtaining such. Clearly the lands had their highest and best use in connection with Curtiss-Wright Corporation, in the use to which it was being put as a modification center and for which

it was required, or for use in connection with the Airport or for uses allied therewith. The land in question was acquired, by the U. S. War Department, as the Commissioners state: "For a use included within said highest and best use * * *, we believe that before and at the date of taking the probability of such a use developing was too speculative and uncertain in the public mind to have affected the fair market value of said premises to the extent claimed by the said witnesses of the defendants. We have, however, considered the foregoing highest and best use * * * in arriving at the appraised values." The modification plant is operated by the Curtiss-Wright Corporation for and on behalf of the United States, and this use is incidental to the war. Its special use for this purpose is not a criterion of its value. The evidence does not support a finding that its present use will continue following the end of the war or that it will then be utilized by the Curtiss-Wright Corporation.

The values fixed by the defendants' experts are based upon the value of the lands as being necessary additions to the Airport. There is evidence in regard to which the Commissioners had the right to believe that the lands are not needed as such additions. Defendants state there is evidence that in or prior to 1940 officials of the Buffalo Municipal Airport recommended the acquisition of the lands in question "in order that compliance be made to the direction of the Aeronautical Commission that the runways of the airfield be extended." So far as I have been able to determine from the record the only proof directed to show the action of the Aeronautical Administration is found in a communication from the Commissioner of Public Works of Buffalo to the Common Council of the City of Buffalo dated November 9, 1940, and referred to the Committee on Finance, etc., on November 12, 1940. This communication recites that the Commissioner was in receipt of a form relative to obtaining aid in financing development of airport facilities. The communication from the Commissioner refers to possible means of the extension of runways over the Curtiss plant land and also over "a triangular piece of land about fourteen (14) acres in area of the so-called Phillips property." It states that if there were an extension northwest and southeast it would be necessary to acquire these 14 acres and that the Commissioners are informed that the cost of acquiring would be

$1200 per acre. It also recommends the purchase of the entire tract of 78.56 acres. No action was ever taken by the city to acquire these lands for airport or any other purposes. There is evidence that the present Airport is inadequate for post war needs, because the necessary length of runways for heavy transport planes could not be obtained by addition to the present Airport without changing the Lehigh Valley railroad lines and also Genesee Street. One of the government's experts testified: "The best information that I can get from, the research man of Curtiss and Bell indicates that this Airport is·not capable of developing with the length of runways in the necessary number of directions that will make the Airport usable for heavy transport planes which would supply the type of service that an industry would want if it was based upon airport transportation. The best information that I can get is that the long distance, heavy weight air transportation will require runways of greater lengths than now exist in the Buffalo Airport, or are capable of construction in the Buffalo Airport without changing the lines of the railroad and the lines of the main highways."

The Commissioners found that "the highest and best use for which the premises taken in this proceeding were available * * * was for an industrial use in connection with, or as an adjunct to, the Airport, * * *." and that "the market for such uses was a very narrow and restricted one and did not lend support to the land valuations placed on said premises by the Defendants' witnesses." and further that "the probability of such a use developing was too speculative and uncertain in the public mind to have affected the fair market value of said premises to the extent claimed by these said witnesses of defendants." The report states that the Commissioners considered these uses in arriving at the appraised values to the extent that "we believe the prospect of demand for such a use affected the market value thereof * * *."

The rule of determination stated by the Commissioners seems the correct one.

"The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the

property is privately held." Olson v. United States, 229 U. S. 246, 54 S.Ct. 704, 708, 78 L.Ed. 1236.

"An owner of lands sought to be condemned is entitled to their 'market value fairly determined.' * * * In that connection the value may be determined in light of the special or higher use of the land when combined with other parcels. * * * But in order for that special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future. * * * In absence of such a showing, the chance of their being united for that special use is regarded 'as too remote and speculative to have any legitimate effect upon the valuation.'" United States v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 1052, 87 L.Ed. 1390.

"So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future." Boom Co. v. Patterson, 98 U.S. 403, 408, 25 L.Ed. 206. Vide also: United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; United States v. Seufert Bros. Co., C.C.Or., 78 F. 520; Matter of Simmons, 130 App.Div. 350, 114 N.Y.S. 571.

As to neither of the parcels in question can it be said that the awards are so grossly inadequate as to justify setting either or both aside. It is not asserted that there was any misconduct on the part of the Commissioners or that there was any grave error of fact indicating grave partiality or corruption. There is nothing in any way to indicate bad faith. What was said in Samuelson v. Central Nebraska Public Power & Irrigation Dist., 8 Cir., 125 F.2d 838, with reference to a verdict of a jury is applicable here. It was there said (at page 840): "In an attack upon the verdict on appeal, we will not undertake to test its pecuniary sufficiency, as such, but only to check the general processes on which the result rests, to see that they do not indicate such controlling arbitrariness or capriciousness on the part of the jury, as would make the trial and its result, in effect, a violation of due process."

The evidence in the case discloses that the defendants defaulted in the payment of taxes on these premises from the year 1932 to 1938, inclusive. The assessed valuation was $18,800. On January 4, 1940, the County of Erie acquired title by tax foreclosure. In 1942, the defendants paid the delinquent taxes and charges in the amount of $29,447.81 and took deeds back from the County of Erie. This was within 11 days of the date of the filing of the Declaration of Intention by the government.

The cost of sewer and water facilities, available only at considerable expense and never utilized, are claimed as elements of value. Prior to foreclosure by the county, the lands had borne a total of $29,000 taxes for those available essentials. The defendants for years had had the opportunity to obtain these facilities. When the instant proceedings were brought, there remained $34,000 assessments existing against the premises and the present acquisition, of course, is made subject to the lien of such assessment. The defendants' principal expert witness placed his valuation per acre on Tract 1 as $1800 excluding consideration of any sewer assessment paid or to be paid. This witness in arriving at the foregoing valuation per acre made an arbitrary allowance at 25% for buildings upon the various compared tracts. In certain instances the value of the buildings much exceeded 25%. Neither this witness nor any other expert witness called by the defendants testified to any personal knowledge of the improvements on the compared tracts; on the other hand they have been described by a witness called by the government who purchased all of the tracts making the assembly of the Curtiss-Wright plant for the Defense Corporation. The report shows that the Commissioners "considered and studied * * * the utility service, such as light, gas, water and sewer which were available to premises."

As to the award made for Tract 2, it is further to be said that the value is to be arrived at from the building structures as connected with the land. Any consideration must be given the question of how much the buildings enhance the value of the land. Just what was allocated to the

buildings and what to the lands separately does not appear. Located as this Tract 2 was, the Commissioners may have given a valuation of less than $1300 per acre for the land in Tract 2. Based upon the value fixed by one of the government's witnesses at $800 an acre, the improvements were valued at $2800. If based on a valuation of $1300 per acre, the improvements were valued at $1200. But the Commissioners had to consider the value of the tract in its entirety, and it can not be said that this award is so inadequate as to authorize the court to set it aside.

Something is said in the briefs with reference to the authority of the Defense Plant Corporation to condemn lands. This proceeding was not instituted by the Defense Plant Corporation. The Declaration of Taking was made by the War Department. It is not seen how the question of the authority of the Defense Plant Corporation to condemn has any relevancy in the consideration of these awards.

The awards must be affirmed.