**UNITED STATES v. WASHINGTON WATER POWER CO. et al.**

**No. 52.**

District Court, E. D. Washington, N. D.

Sept. 22, 1941.

Lyle Keith, of Spokane, Wash., and B. E. Stoutemyer, of Portland, Or., for petitioner.

Alan G. Paine and H. E. T. Herman, both of Spokane, Wash., for defendants.

SCHWELLENBACH, District Judge.

Since by the terms of the pre-trial stipulation the only evidence in the case about which there is serious controversy is defendant's evidence as to power site value, I deem my decision upon the government's objection thereto of sufficient importance to justify my presenting my ruling in writing.

The evidence to which the Government objects was outlined in defendant's counsel's statement of last Tuesday. That there may be no question about what the defend-

ant hopes to prove, I will incorporate that statement in its entirety in this ruling.

"Opening Statement of Defendant.

"The Court: When you made the suggestion about not making your opening statement, my first reaction was to say no, you should make an opening statement, because it seemed to me if you were asking me to pass upon the admissibility of evidence I should have a complete statement of what evidence you proposed to introduce. However, I realize that if you made an opening statement to the jury today and they didn't come back until Monday, with all due respect to you, they may have forgotten the things you said by Monday, so I decided right on the spur of the moment that I would ask you to make a rather complete statement now, such as you would have made to the jury, of your evidence and then if I rule that the evidence is admissible you can then make it to the jury.

"Mr. Paine: Yes, I think that is a good idea. If Your Honor pleases, in compliance with Your Honor's request, I don't believe it will be probably necessary to go quite into details in regard to the qualifications of the witnesses and that matter that I may have gone into at length with the jury. What Your Honor wants, I assume, is a statement of the position of the company and the evidence we propose to offer in regard to the value of these lands.

"Now, as I conceive the issue, the sole question remaining is the fair question of the fair market value or the just compensation to be given The Washington Water Power Company for these lands. Our testimony will show that the tract of land involved here and as sought to be condemned by the Government, as appears from the stipulation, is a part of a larger tract of land located at Kettle Falls upon the Columbia River; that these tracts sought to be condemned are what we refer to as upland lands or the critical lands in connection with the development of a power site; that due to their characteristics—and we will offer evidence, including maps, pictures and other evidence of that sort, of the nature of the lands themselves; that they consist of a rocky dike or dam, in effect, lands stretching across the Columbia River at Kettle Falls made up of a quartzite formation rising rather precipitously on either side of the river and consisting of an island in the center of the river; that across these lands a power development can be readily constructed, all of which is contained in

essence in the stipulation; that the nature of the soil, the rocky nature of the soil, is such that it is possible to develop the complete foundation for the building of the dam, the wings and abutment of which lie upon our lands, the other portion of the dam extending out across the middle of the bed of the Columbia River.

"We contend and we will offer evidence that all of the lands that we own are what in law are known as uplands or lands to which we have absolute fee title above the highwater mark of the river. We are not contending, and I think Your Honor should have this in mind—we are not contending for any value or any ownership in the raw water of the river as such and the flow of the river as such. We are not contending that we have any vested or inherent right in the bed of the stream or in the flow of the river or that we have any legal ownership in the bed of the stream or in the flow of the river or that we have anything such as was referred to as a hypothetical additional value of the water power above on the river. We do contend and will offer proof to show, as I say, that our lands were so situated in relation to the river that they afforded the proper place and the feasible place for the location of a hydro-electric development and the abutments of a hydro-electric plant. We will show further, if Your Honor please, that these lands can be utilized by utilizing the flow of the river and the necessary uplands for overflow by the side of the dam to create a hydro-electric development; that the enhanced market value of these lands has been recognized from the earliest time that the land came upon the market; that the land came upon the market first shortly after the Colville Indian Reservation was opened up in 1906 to settlement or to taking by individuals; that the first sale of the land occurred shortly thereafter, in which the uplands involved in this proceeding were sold for $80,000 on the market; that the lands were then sold again in 1912 to the Granby Company for use in developing a power site for $100,000; that thereafter the lands were sold by the Granby Company to The Washington Water Power Company in 1921 for $150,000.

"The Court: This $80,000 was in contemplation of a dam, was it?

"Mr. Paine: The $80,000 was the market price fixed by the seller, who was Mr. I. N. Peyton and another party who had individually taken the land up, and they were sold to Mr. J. P. Graves, who had in mind ulti-

matcly using the land for the development of a power site upon the Columbia River; that the sale to the Granby Company was made upon the basis of their potential value, of their use that could be made of them in developing a power site upon the Columbia River; and that the Granby Company held them for that purpose in connection with the development of their own copper-reducing plant that the Granby Company was operating; that they were then sold to the Washington Water Power Company for the purpose of utilizing them as a power plant in connection with the electric distribution system of The Washington Water Power Company.

"We will show, in other words, that private capital has been seeking these lands from the time that they were first placed upon the market and has been seeking them because the value that they had as part of a developed hydro-electric system or development; that the Washington Water Power Company, after it acquired the titles to the land in 1921, proceeded at once to take the necessary steps to develop the use of this site and bring it into use as a hydro-electric development; that in order to make use of such a site it is necessary, of course, to obtain the right to use the bed of the stream, which under the laws of the State of Washington belongs to the State of Washington. It is necessary to secure the permits to appropriate the waters of the Columbia River from the State of Washington. It is also necessary to secure permission from the United States Government, through the Federal Power Commission, for authority to locate any hydro-electric development or construction of this sort in the stream; and it is necessary to secure ultimately the lands which will be overflowed by the backwater of the dam to create a reservoir for the dam; that the company at once proceeded to take the necessary steps to secure these various permissions to make the necessary development; that it filed at once with the Federal Power Commission an application for a preliminary permit to go ahead with this development; that this preliminary permit was granted by the Federal Power Commission, and that in pursuance of the granting of the preliminary permit the company proceeded to do core drilling, diamond drilling of its own lands to determine the condition of the rock formation that would be necessary in the base of the dam itself; that they did what is known as wash boring of various sites, where the tubes are run down and wash boring is made to determine

the depth of the foundation necessary for the construction of the dam; that they proceeded to make all of the necessary surveys for the backwater overflow to determine where the lines of overflow would come and the lands that would be necessary to acquire to make the building of the dam feasible and not raised above the Canadian boundary, which was a limiting factor in the development of the dam.

"We will show that in addition to that they went ahead with those various steps, acquiring this information. They established gauging stations in the stream in order to ascertain the exact amount of flow of the river to figure the type of development of the dam and hydro-electric plant necessary to best utilize the total flow of the river at its high and low water stages; that in the process of doing these various things, from 1921 on the company has made a total investment in the property, including the purchase of its land, of $471,653.25 as an indication of the interest of the private power, private capital, in the development of these lands for power site purposes; that it took the necessary steps to secure the state lands; that agreements were made with the State Commissioner of Land for the purpose of all the right that the state had in the shore land of the Columbia River and a figure was agreed upon of approximately $29,000 for the purchase of the necessary state land; that appropriations of the water were filed with the State Supervisor of Hydraulics; that those appropriations of the waters of the Columbia River had priority over any other appropriations and no other appropriations having been made they were rated and given the necessary priority to use the waters of the Columbia River.

"That this activity extended over some considerable period of time; that during the process of development of the site the company also acquired its Chelan site over on Federal Reserve lands at Lake Chelan, and that the matter was taken up with the Federal Power Commission and in the interest of the type of development it was decided between the company and the Power Commission that the Chelan site, which was also a Federal license project, should proceed ahead of the development of the Kettle Falls site but that the Kettle Falls site application was kept in good standing and permitted to remain with all the priorities that it had in the files of the Federal Power Commission; that after development of the Chelan site we ran for a period into

the depression and no activity was urged very strongly upon us by the Federal Power Commission towards the building of the Kettle Falls site, but after the depression began to wane in '34 and '35, the company then proceeded to file its application and secure all the necessary information for the Federal Power Commission.

"At this time they urged upon us that the fullest development of the site be made, namely, that it be developed to secure a head which would back the water completely up to the Canadian boundary so that all of the fall of the river that could be developed from the Canadian boundary down to Kettle Falls should be developed and that a small project should not be put in that would then make it impossible to locate at any other point north of Kettle Falls below the boundary a plant to develop that additional head or make it impossible for the type of development at Kettle Falls to be expanded or put in an additional head at that point; that the requirements also were that we should take into consideration navigation and provide for the installation of the necessary locks in the dam and the necessary fish ladders to take care of the fish;

"That in accordance with their requests in this regard we did a great deal of work in determining the necessary height of the dam and the backwater, all of which was turned over to the Government for their use in connection with the Grand Coulee dam's backwater and the gauging of the river; that actual estimates, specifications and drawings of the proposed hydro-electric development were made so that the company was and is ready at the time, to immediately start construction had not the Grand Coulee dam been built and the property of the Government taken from it.

"Then in addition to proving that and the total amount of the investment of the company in the property, we will offer evidence by competent engineers, qualified engineers who have been engaged for many years in the designing and construction of power projects of this type all over the United States that, supplementing the stipulation, that it is physically possible to construct a feasible and safe dam at Kettle Falls; the testimony of those engineers that such a construction of such a dam is practical from an economic standpoint; the estimates and specifications and drawings of the dam and the costs of the dam showing a preliminary cost to the first stage of the development of that dam of around eight and a half or nine or nine and a half million dollars, the higher stages around $11,000,000 and the final stage bringing the total cost of the dam up to around $31,000,000; that this power site, since it is the only one on the Columbia River, that is adaptable to development in stages—by that I mean that the conformant of the land is such at Kettle Falls that you can put in what they call a low dam, a low head to the dam for around $9,000,000 and develop the power at that point with that head of water; that then, without the necessity of reconstructing or tearing out that dam, it can be increased and raised by two more stages to get in the total ultimate and proper development of that site; that such a situation lends itself to commercial development by private capital very much more readily than the Grand Coulee type of construction or the type further on down the stream at Foster Creek or any of these other sites where the dam must be constructed at the very beginning to its complete and ultimate development, which necessitates, of course, the outlay of a very materially larger amount of capital before the dam would be put into production and revenue from the sale of hydro-electric energy can be made to pay a return upon the investment; that the installation of the first units of the dam would cost, as I say, around nine and a half million dollars and that the kilowatt-hours to be developed will be at a cost of eighty-six dollars a kilowatt; that this eighty-six dollars a kilowatt is one of the cheapest costs of development or the cheapest price that could be gotten anywhere in the northwest.

"That the Washington Water Power Company, due to the rapid increase in population and demand for power and the loads that can be expected in this territory, had reached a point where in 1937 and '39, beginning back in 1937, would have to make provisions for the obtaining of additional power for the supply of its system; that The Washington Water Power Company is interconnected with the other great power systems of this region, the Puget Sound Light and Power, the Idaho and the Montana Power Company and the Pacific Power and Light Company; that the total demand for the interconnected system is such that private capital, especially the Washington Water Power Company, would at that time, but for the taking of the property by the Government in the construction of the Grand Coulee Dam, have been ready to start upon the construction and would have

started the construction of this damsite at Kettle Falls; that in addition to this, we will show that in the Federal Power Act [16 U.S.C.A. § 791a et seq.], the Federal Power Act provides for the licensing of projects upon rivers; provides for the ascertainment of the original costs of those projects, the actual investment that the company has in those projects, as a basis upon which the company can proceed to capitalize or to use their property; that the likelihood of the Federal Power Commission granting these licenses has been such in the past, where the developments have been sound financially and economically, that the owners of that type of property have had an enhanced market value in their property due to its adaptability for this type of development.

"We will show, by offering proof here by competent witnesses, such as Mr. J. P. Graves, an expert who has lived in the territory since 1897, who has bought and sold numbers of power sites in this territory, who has been engaged in the construction of many industries and businesses which utilize electric energy; was engaged as director and president for a long time of the Granby Copper Company, which developed three sites in the territory; was head and the moving spirit of the old Spokane and Inland Railroad and bought the Nine Mile site upon the Spokane River; was instrumental in purchasing the site of the present company's plant at Chelan, which is also a Federal licensed project and includes Government lands, knows the values of power sites in this territory, even where located upon navigable streams and where the question of the necessity of securing a permit from the Federal Government is one of the elements that is taken into consideration between buyers and sellers. Not only is he familiar with these, but he is familiar with the Kettle Falls project in particular, having been one of the early owners of the property and sold it to the Granby Company, and he will place the fair market value of the property, in his opinion, the fair market value of the property on December 9, 1939, in the neighborhood of around half a million dollars. We will offer testimony of other experts, such as Mr. Shea of Wenatchee, who has been in this territory for a good many years. He is acting at the time as right-of-way agent or purchasing agent for the Puget Sound Light and Power Company and is familiar with this type of property. He will testify that he is familiar with the sale of properties involved at the Rock Island dam, which is a dam located upon the Columbia River directly south of Wenatchee in the State of Washington; that the land involved in that site, the uplands, which correspond to the land involved in this site, were purchased and sold upon the open market prior to the obtaining of any license from the Federal Power Commission to develop the site; that the total price paid for them was in the neighborhood of $120,000 for the site itself; that the site, for agricultural purposes, is wholly valueless, consisting of nothing but bare rock along the sides of the Columbia River and an island in the Columbia River, similar to the situation here; that he is familiar with the fair market value that would be paid for uplands of this type, taking into consideration all of the factors which go to make up the probability or lack of probability that these lands could or could not be used for power site purposes; that they would command and would have commanded upon the market in December, 1939, prior to the taking of the property by the Grand Coulee, a fair market value close to half a million dollars. We will also have the testimony of other experts, Mr. Walter Leighton of Washington, D.C., who is familiar with the purchasing of these types of power sites throughout the United States for power site lands. Power site values are recognized, even if the ownership of the water is conceded to be in the Government; that the Government itself recognized that type of value in properties located in its reserves or adjacent to its streams; that in his opinion, he is familiar with this site up here; that taking into consideration all of the things surrounding the situation as it exists that these lands had an actual fair market value on the market at about that time in the neighborhood of a half a million dollars or something of that nature, and that therefore the company is entitled to show the fair market value as near as you can in this type of a case by showing the fact that the site itself is adaptable; that the development is one of great value; that if you owned the power and everything free in fee, absolutely apart— if you could obtain private ownership of it —that value would probably be in the neighborhood of about $3,000,000, and without that ownership and the fact that you only have here your abutting lands, that you have to capitalize your abutting lands in the Federal license, which is part of the proceeding by which you acquire the site, apart from any hypothetical value or any

additional value that it may have; that in order to award us just compensation we are entitled to have whatever the jury finds, taking all of those facts into consideration, was the fair market value of those uplands, exclusive of the right to use the river but taking into consideration all of the facts in regard to it. Now, I could give you more in detail the qualifications of the witnesses as engineers, more in detail the specific facts in regard to the amount of power that could be developed, the cheapness with which it could be sold and how it could be applied as we intended to into the system of The Washington Water Power Company, but I don't think that is what Your Honor has particularly in mind. That all goes really to the amount of the award rather than to the fundamental question of whether we are entitled to show to the jury at all that this type of property has that value upon the market, as represented both by our investment in it and by the prices that it could have been sold and transferred for if it hadn't been taken by condemnation.

"The Court: All right.

"Mr. Paine: In addition to that, we will have, as Judge Herman reminds me, testimony to show that negotiations were had; that the reservoir land could be readily acquired, and we have already stipulated as to the amount of money that would be required to acquire those reserve lands—I think $3,000,000. We will show also by Mr. Kinsey Robinson, president of the company, that the company was in such financial condition, representing a total valuation of the company around seventy million or seventy-five million dollars, that the company had refinanced its mortgage bonds in the spring of 1939; that it had available and could readily have obtained by the sale of bonds and by the loaning of money from its parent companies the necessary capital to have proceeded with the development, and that the over-flow land could readily have been obtained; that we obtained the over-flow lands of Coeur d'Alene Lake and Lake Chelan, where there were many more different parcels of land, and there were no obstacles in obtaining the over-flow lands that were appropriated, and the building of this site is practical from a feasible and economic viewpoint."

To this offer, plaintiff interposes two objections:

1. That under the rule laid down in United States v. Chandler-Dunbar, 229 U. S. 53, 33 S.Ct. 667, 57 L.Ed. 1063, followed in Continental Land Co. v. United States, 9 Cir., 88 F.2d 104, certiorari denied October 11, 1937, 302 U.S. 715, 58 S.Ct. 36, 82 L.Ed. 552, a riparian owner has no property right in the bed of the stream or to the use of the water or the power inherent therein as against the United States and is, therefore, barred from a recovery for any power site value of its riparian lands.

2. That, because paragraph 12 of the pre-trial stipulation includes an admission by defendant that the backwater from a dam constructed at Kettle Falls would flood approximately 518 tracts of privately owned land and approximately 400 different ownerships and would also flood some withdrawn or reserved public land of the United States (including Indian reservation land) and also some State land, therefore defendant is not entitled to recover power site value under the rule that no owner of any one or any number of tracts less than the whole is entitled to any part or any share of the value of the whole in condemnation proceedings unless there is a reasonable probability that all the ownerships could be combined. This argument is made despite the fact that in Mr. Paine's opening statement he stated that defendant's testimony would show that reservoir lands could be readily acquired.

The questions involved in the discussion of the plaintiff's objection were thoroughly briefed. Many cases were presented to the Court. I want to assure counsel on both sides that each one of these cases was carefully examined and re-examined and carefully studied and re-studied.

I have reached the conclusion, however, that my decision on this point should rest exclusively upon my opinion as to whether or not the Continental Land case is controlling in the case at bar. This is not because the Continental Land case involved the same river and the same government project as are involved here. The importance of the Continental Land case, so far as this case is concerned, lies in the fact that it was decided upon by the Court of Appeals for the Ninth Circuit and that the decision in effect had the approval of the Supreme Court. If the Circuit Court decided the precise questions which are now presented to me, then I am controlled by it. If, on the other hand, it can be distinguished from the case

at bar, I feel this defendant should be entitled to complete its record in this trial if for no other reason than to prevent a duplication of the expense of preparation.

Defendant presents the following points of difference between the evidence in the Continental Land case and its proposed evidence in this case:

1. That the lands involved in the Continental case were acquired by their owners for a small consideration with no purpose of using them as abutments in the construction of a dam. It is pointed out here that since the opening of the lands here involved for public settlement, these lands have been repeatedly sold and resold on the basis of their value for power site purposes. It is asserted that the testimony will show that the defendant paid $150,000 for these lands in 1921.

2. In the Continental case, no development work was ever done by the owners looking towards the use of those lands for power site purposes; no application for rights was ever made to the Federal Power Commission; no one of the owners ever spent a cent in an effort to ascertain whether those lands were available for power site purposes. On the other hand, defendant's opening statement outlines an almost continuous activity from 1921 down to 1936 looking towards the ultimate use of the defendant's property for the construction of a dam. Applications were made to the Federal Power Commission, to the State Supervisor of Hydraulics of Washington, negotiations were conducted with the State Land Commissioner of Washington, and engineering and financial surveys were made as a result of all of which expenditures were made by the defendant corporation in a total amount including the cost of acquisition of $471,653.25.

3. That the geological structure at Grand Coulee where the Continental lands were located was such that to develop a full use of the project the immediate construction of a high dam was necessary which involved the expenditure of $170,-000,000. By comparison, it is asserted that the geological structure at Kettle Falls was such that an original dam in the amount of approximately $9,000,000 could have been constructed on which there might later be imposed a higher dam at a cost of $11,000,000 and upon which there could be superimposed an additionally higher dam at an additional cost of $11,000,000.

4. That in the Continental case the evidence revealed nothing to indicate either the ability or willingness of private capital to proceed with the construction and development of that enormous project. Defendant asserts that its evidence will prove that it was ready, able and willing to have proceeded with the construction at Kettle Falls had it not been prevented from so doing by the plaintiff.

5. Defendant's counsel states that it is presenting this case on a different theory than that pursued by counsel in the Continental case. There counsel relied upon the "inherent adaptability" theory asking for a verdict in an amount of three to four million dollars on the basis of the ratio of value which the lands used for the placing of the abutments to the dam would bear to the total structure. In this case counsel for defendant contend that they are not claiming any right to the use of the bed of the river or the water flowing over it but are simply asking the value of their lands upon the basis of what private capital would pay for them in the event they should sell them to private industry seeking to use them in the construction of a private power dam. In that, counsel contend consideration would have to be given to the expenditures which defendant has made such as above described.

It must be apparent to anyone that these constitute real differences between the facts proved in the Continental case and the facts proposed to be proved in this case. The question for me to decide is whether or not the appellate court, in deciding the Continental case, was influenced by any of the facts in that case which were different from the facts in this case. To decide that question, I must look at the opinion of the Court, the briefs of the parties and the transcript of the record on appeal. Each of these I have carefully examined. Let us now attempt to analyse what they contain.

### Appellants' Opening Brief.

In their brief the appellants outlined the procedural situation in their statement of the case and outlined appellants' testimony in their statement of the facts. Next we find on page 15 the following:

### "The Question on Appeal"

"The question on this appeal is, Whether, on the facts contained in the record, the Court erred in striking Appellants' evi-

dence, and instructing the jury not to consider the adaptability of the land for use as a damsite, in determining its market value."

The assignments of error went to the trial court's granting of the motion to strike from the record all testimony in regard to the market value of the land in question for damsite purposes, the claims of error as to instructions given and refused and in denying appellants' motion for new trial and entering judgment for the Government.

The next item in the brief was entitled "Brief of the Argument." Under this we find the statement that the special adaptability of the lands was conceded. This coincides with the provisions of paragraph 7 of the pre-trial stipulation here.

Next comes the statement of the rule that inherent adaptability of property for special use must be taken into consideration in determining the market value.

The next question raised is in reference to Judge Webster's ruling and the reasons stated therefor. Appellants contended that the mere fact that appellants did not own or have a license to the river bed does not exclude evidence of special adaptability. In support of that, the appellants there cited the same cases as are cited by defendant here starting with Mississippi & Rum River Boom Company v. Patterson, 98 U.S. 403, 25 L.Ed. 206, down to Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236. The appellants then contended that the fact that they did not own or have the right to use the flow of the river did not · exclude evidence of special adaptability. In support of that they relied upon the same cases as they had cited on the previous point except that they added thereto the case of United States v. Chandler-Dunbar Company, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063.

The third point was that the fact that the Columbia River is navigable and that the Government was taking appellants' land in the aid of navigation did not exclude evidence of special adaptability. In support of that, they cited the same group of cases and added Boston Chamber of Commerce v. Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725.

The appellants then concluded their brief statement of their argument with the point that the improvement of navigation was not in the case and added then the citation of Monongahela Navigation Company v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463.

Appellants then proceeded into a detailed argument of the points which I have just outlined. While the language that they used was different, I am convinced after careful study of it that, in its fundamental effect, the appellants presented there precisely the same argument as has been so ably presented by defendant's counsel here. While they cited other cases which have not been cited to me and while they failed to cite some of the cases which counsel has cited to me, it is apparent that the cases upon which they mainly relied were precisely the same cases upon which defendants rely here, Mississippi River Boom case and the Monongahela Navigation case, Olson v. United States and that portion of the Chandler-Dunbar opinion in which allowance for canal and lock purposes was approved by the Supreme Court. Of particular importance is the statement of summary and conclusion found on page 66 of their brief as follows:

"Summary and Conclusion

"I. We Believe That It is Fair to State That the Following Facts Are Established Either By Admission or By Competent Evidence.

"1. That Appellants' lands, which are taken in these proceedings, are uplands, situated above ordinary high water mark.

"2. That Appellants' uplands possess inherent adaptability for use as a damsite.

"3. That they are the only lands in existence which are suitable and available for a damsite useful for the development of hydro-electric Power, and for irrigation, by using Grand Coulee as a storage reservoir.

"4. That these uses can be accomplished only by building a dam across the Columbia River at Grand Coulee, and that no such dam can be built without using Appellants' lands.

"5. That, at the time of taking, there was a market for Appellants' lands for use as a damsite, by others than the Government, and that there was a 'legal and practical possibility' of their being acquired and used for that purpose.

"6. That, the market value of these lands was greatly increased because of their adaptability for a damsite, and that their market value can not be determined except by considering such adaptability."

We next come to the appellee's brief.

Here we find a detailed statement of the evidence which includes the full statement of Judge Webster in deciding the case of this Court.

Next comes the appellee's brief statement of its position found on pages 25–29 inclusive of appellee's brief. In that brief the Government made three contentions:

First, That Judge Webster's decision was correct on the proposition that the Government's paramount right, title and control of the beds and waters of navigable streams would defeat any claim of a riparian owner to the value of riparian upland lands for use as a damsite. In support of that decision, the Government relied upon the Chandler-Dunbar case, the case of Lewis Blue Point Oyster Co. v. Briggs, 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L. Ed. 688. On this point the authorities relied upon by the Government are the same as those relied upon by the Government here except that they now have added the case of United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, which had not at that time been decided.

Appellee's second point was an attack upon the Continental Land Company's witnesses because they were not qualified as experts.

Appellee's third contention was that diversity of ownership and the large number of tracts which would necessarily be flooded defeated Continental Land Company's claim on the theory that where it was necessary to combine ownership of different properties in order to create a value, such value would not be permitted to be used as a basis for compensation of a claim in a condemnation action. In support of that point, the Government relied upon precisely the same cases as have been presented to me by Mr. Stoutemyer.

So far as I have been able to analyse appellants' reply it was, in effect, merely a re-statement of the arguments presented in its opening brief.

The next question, then, is what did the Circuit Court of Appeals decide? Briefly stated, that Court sustained the position of the Government as to its first point. It ignored the Government's second point. As to the third point, the Circuit Court sustained the position of the Government that the lands had no inherent value for the purposes claimed because there was no evidence of reasonable probability of the combination of these lands with other necessary lands which would be required to complete the project for private use. However, on this point the Circuit Court did not go as far as counsel for the Government contended there or contends here. It chose to follow the rule laid down in McCandless' v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205, in which it was held that the fact that such use can be made only in connection with other lands does not necessarily exclude it from consideration if the possibility of such connection is reasonably sufficient to affect the market value. In writing the opinion for the Circuit Court, Continental Land Co. v. United States, 9 Cir., 88 F.2d 104, 109, Judge Neterer outlined in extraordinary detail the facts of and the background for that case. He quoted at length from the decision of Judge Webster and concluded that quotation with the statement: "The court could well rest affirmance upon the statement of Judge Webster in striking from the jury's consideration the evidence relating to dam site value." However, Judge Neterer saw fit to proceed with a further discussion of the Government's first point citing various cases and concluded with this language:

"No persuasive merit is impressed by argument that the court in this case was dealing with water power as a separate unit of property and inherent adaptability of the land ('Hypothetical additional value') as here contended for was not considered. All the expressions of the court in relation to each other, considered as a whole in disposition of the issue before it, are to the contrary.

"It is axiomatic that if the riparian owner has no right to approach the river as against the right of navigation, he has no inherent right of value 'adaptable to special use' over and above the reasonable market value of the upland for any purpose to which it may reasonably be adapted now, or in a reasonable time in the future. This was fairly submitted to the jury. This issue is no newly created relation or right, but has existed long prior to the private ownership in the land. The rights were fixed and relations established by the adoption of the Constitution."

The remainder of Judge Neterer's opinion is directed to the third point presented by the Government upon the question of diversity of ownership. It was in the consideration of this point that Judge Neterer, for the first and only time, discussed the

facts of that case insofar as those facts differed from the facts of this case. Counsel for defendants contends that because those different facts were discussed in that portion of Judge Neterer's opinion that it must be concluded that those facts influenced that Court in its decision on the Government's first point. I can not agree with that contention. Nowhere in Judge Webster's decision nor in that portion of the opinion of the Circuit Court dealing with the Government's point number one is there any indication that any of the facts which I have outlined in points 1–4 inclusive in my classification of the differences between the facts here and the facts in the Continental case were ever even considered. The mere fact that Judge Neterer mentioned them in discussing the Government's third point has no relationship to the consideration of the first one.

However, as I previously stated, defendant's counsel is presenting this case on a different theory from that pursued by counsel in the Continental case. He stated that he is not using the "inherent adaptability" theory and that when Judge Webster and Judge Neterer used the language "hypothetical value" they had in mind an entirely different situation than that which he presents here. He states that he is making no claim to the right to use the bed of the river nor to the use of the water. He, therefore, contends that he presents an entirely different case than that upon which Judge Webster and the Circuit Court of Appeals passed. Let us examine that argument.

■ Any money which defendant has spent in purchasing, investigating or improving this property was spent for the purpose of its use in providing abutments for a hydro-electric power dam. If it had not been suitable for that purpose, defendant would not have paid $150,000 for it nor would it have spent another cent upon it. Aside from its use as agricultural land, defendant's land is valueless except for power site purposes. Unless it is used for power site purposes, it is also valueless regardless of how much money has been spent upon it. None of these prospective purchasers would have been interested in it had they known that they could not build a dam across the river at that point. The use of the bed of the river and the flow of the stream is insuperably connected with the use of the adjoining uplands in creating a value for power site purposes. Defendant could have spent $5,000,000 or $500,000,000 in the development of this property without making any difference. It only became valuable when it could earn on an investment through the creation of profits resulting from the sale of electrical energy. That value does not exist in a riparian owner as against the United States. I appreciate that counsel for defendant, with the utmost earnestness and all sincerity believes that he has offered to present a different case than that presented by the attorneys in the Continental case. He thinks that by disassociating the claim for the uplands from the claim for the use of the bed of the river or the flow of the stream that he can make out a case for a separate value. There is no such value. The uplands can not be disassociated from the bed of the river and the flow of the stream. Without the use of the bed of the river or the flow of the stream these uplands are no more capable of use for power site purposes than any other land in the arid region of Central Washington. But counsel says that they have actually expended almost half a million dollars in the purchase and development of this property as a power site. They might have gone further and have installed all of their generating equipment and their transmission lines but they still would not have had anything of value as a power site. It takes the flow of running water to create value on hydro-electric development. The Government controls that. The Government has always controlled it and it is immaterial how much money defendant may have spent it would not get a power site of any value. Let me illustrate by what is probably an absurd example. Sometimes it requires absurd examples to bring out the fallacies of very appealing arguments. I might spend an unlimited sum building and equipping a sanitarium for nervous patients on the land between the Milwaukee and Great Northern tracks in the center of Spokane. I might invest there a million dollars. I might have every piece of equipment known to modern medical science. It would not have the slightest value as a sanitarium for nervous patients. Should a condemnation action be brought against the property, I could recover nothing on the basis of its value as a sanitarium. Unfortunately, the defendant here invested its money and expended its funds in an effort to create a value which could not exist separate and apart from the use of other property which the Government controlled and which the Government decided not to permit this defend-

ant to use. The defendant very naturally feels aggrieved that it is compelled to suffer this loss. It, however, must be realized that it purchased this property and expended these funds after the passage by the Congress of the Federal Power Act and eight years after the Supreme Court had decided the case of United States v. Chandler-Dunbar Co., supra. Despite that fact, however, I would be strongly inclined to consider that portion of counsel's argument were it not for the opinion of the Supreme Court in the Appalachian Power case. There the Court said 311 U.S. 377, 61 S. Ct. 307, 85 L.Ed. 243:

"The Federal Government has domination over the water power inherent in flowing streams. It is liable to no one for its use or non-use. The * * * exclusion of riparian owners from its benefits without compensation is entirely within the Government's discretion. * * * Water power development from dams in navigable streams is from the public's standpoint a by-product of the general use of the rivers for commerce."

I am forced to the conclusion that there is no real distinction between the facts of this case and the facts of the Continental case. Therefore, despite my determination to permit the introduction of this testimony if a way could be found to justify it, I am now convinced that it would be of service to no one to take the time or to expend the money necessary to permit the introduction of defendant's proposed testimony. It may well be that the Circuit Court will decide that on the basis of the different facts of this case it will make a different ruling from that in the Continental case. Until then, I am bound by that decision.