## UNITED STATES v. WEST VIRGINIA POWER CO. et al.

### No. 13.

District Court, S. D. West Virginia.

July 28, 1944.

Leslie E. Given, U. S. Atty., and John R. Dyer, Sp. Atty., Department of Justice, both of Charleston, W. Va., for plaintiff.

Raymond T. Jackson, of Cleveland, Ohio, Jesse Knight, of New York City, and Ernest K. James, of Charleston, W. Va., for defendant.

MOORE, District Judge.

On June 26, 1939, condemnation proceedings were instituted by the United States for the purpose of acquiring fee simple title to certain of the lands of defendant West Virginia Power Company (hereinafter referred to as the Power Company), comprising thirty-nine tracts in Summers and Mercer Counties, West Virginia, being part of the reservoir to be created by the erection and operation of the Bluestone Dam, located about two miles above Hinton, West Virginia, on the New River.

The Bluestone Dam, when constructed according to the plan thereof authorized by Congress, will create a reservoir 150 feet in height above the present river level. The plan calls for the use of 120 feet of this reservoir for the purpose of furnishing water power for the generation of electricity. The remaining 30 feet will be used as a flood control reservoir in which flood waters above the dam will be alternately stored and released. This flood control project is part of a comprehensive National system of flood control dams, which, when completed, will have the effect of maintaining more or less constant river levels in the Kanawha, Ohio, and Mississippi Rivers.

By order entered on November 21, 1941, the United States was given immediate possession of the land sought to be condemned, and commissioners were appointed on December 11, 1941, to determine the amount of just compensation to the owner.

The commissioners, after hearing the evidence of both parties, filed their report on September 30, 1943, to which report both the United States and the Power Company filed exceptions, and the case is now pending for jury trial on exceptions to the commissioners' report.

By agreement of the parties, a pre-trial conference was held on April 6, 1944. At this conference, the suggestion was made that the court determine in advance of the trial certain questions relative to the admissibility of evidence, so that the parties may have the benefit of the court's de-

termination with respect to such questions in preparing for trial. These questions were embodied in a pre-trial order entered on April 12, 1944. The questions propounded by the United States are as follows:

1. Whether the owner of lands bordering on a navigable stream is entitled to introduce evidence of or recover compensation for their value for dam site and hydroelectric power purposes when such lands are condemned by the United States for the improvement of navigation.

2. Whether the respondent can introduce as evidence moneys expended by it, or its predecessors in title for preliminary studies, topographical maps, exploration studies, general engineering work, surveying, borings, stream gauging, legal abstracting expenses, taxes, insurance and other costs incurred in connection with the prospective establishment of a dam and hydroelectric power plant or for the purpose of developing such lands for such future uses, or for interest on the moneys expended by respondent, or its predecessors in title, for the aforesaid purposes.

3. Whether or not the respondent can introduce evidence of or recover severance damages in this suit for its rights, if any, in the three tracts of land at Bull Falls not sought to be condemned and not described in any pleadings filed in this case and which tracts are not contiguous to the lands being condemned but are separated therefrom by intervening fee ownerships, and where such tracts have never been applied in actual unity of use with the lands being condemned and such unity of use, if any, being only prospective, and when fee title to such three tracts of land is not in respondent, but is in a third person or persons not parties to this proceeding.

The questions propounded by the Power Company are as follows:

1. Are the rights of condemnee in and to the property on New River at Bull Falls, which is within the Bluestone Reservoir as contemplated by petitioner but is not described in the petition, to be included in the property for which compensation must be paid in this proceeding?

(a) What is the nature and extent of such property rights?

2. What is the measure of compensation to be paid for the property to be taken in this case?

(a) Is not such measure of compensation the market value of said property in the light of the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future, taking into account any requisite governmental consent?

3. May such market value take into account any suitability the property may have for dam site-and-reservoir purposes?

4. What is the effect of the fact that the condemnee does not own all of the lands and rights which would be needed for condemnee's project?

5. What is the effect of the fact that New River has been held to be navigable-in-law?

6. Is evidence of condemnee's purchase prices for its lands and rights and its further investment (by way of other expense of acquiring lands and rights, costs of abstracts, title examinations and miscellaneous legal expense in connection with said acquisitions, interest, taxes and insurance, borings and other explorations, engineering, geological investigations, surveys, stream gauging, and costs of materials, labor and supplies) relevant to the determination of fair market value?

In view of the importance of the answers to these questions as affecting the amount of compensation to be awarded the land owner, it seems proper not only to state the court's conclusions upon the legal questions presented, but also to give the reasons which impel the court to reach these conclusions.

All the questions, with the exception of petitioner's number 3 and the Power Company's number 1, resolve themselves into one fundamental question, which is: Under the circumstances of this case, may the Power Company introduce evidence of the value of its land for water power or dam site purposes?

The Power Company has filed able and comprehensive briefs in support of its contention that it has the right to compensation for its land on the basis of a valuation of the land for water power and dam site purposes. Its arguments may be briefly summarized as follows: It concedes that the United States possesses a dominant easement, for improvement or control of navigation, in the flow of the water in New River at the site of the Bluestone Dam; but it says that (1) the Bluestone project

is not intended to and does not affect navigation; (2) that the United States has no dominant easement for the purpose of flood control; (3) nor for the purpose of generation of hydroelectric power; (4) and that, therefore, its land being taken for these latter purposes and not for navigation control or improvement, it is entitled to compensation for the value of the land, including its value for water power and dam site purposes. It distinguishes between the power and authority of the United States to engage in the Bluestone Dam project (which it acknowledges has been definitely established by decisions in this very case) and its obligation to pay just compensation for property taken.

This distinction between the power to acquire the land and the obligation to pay just compensation is a clear and valid distinction, and would be controlling if the premise of the Power Company's argument should be granted; namely, that the United States is acquiring this land for purposes other than those as to which it already has a dominant easement. It therefore becomes necessary to examine the basis of the Power Company's contentions in this respect.

It was said by our Circuit Court of Appeals in the case of United States v. West Virginia Power Co., 4 Cir., 91 F.2d 611 (a case dealing with this same Bluestone Dam project), that "it (the Bluestone Dam) has been approved as a proper and necessary aid to flood control, navigation, and the production of water power." In a later decision of the same court (United States v. West Virginia Power Co., 4 Cir., 122 F.2d 733, 738), and order sustaining demurrers to the petition for condemnation filed in the instant case was reversed. Judge Parker said: "The project is undoubtedly one of the most important flood control projects in the country. It was recommended by the Army Engineers and authorized by the Congress as part of a nation-wide plan of flood control. It has relation not merely to the New River and the Kanawha, but to the larger problem of flood control in the Ohio and Mississippi Rivers. The fact that production of power is combined with flood control in the project does not condemn it; for it is for Congress to say what type of project will best serve the constitutional purpose it is pursuing and to what extent flood control should be sacrificed to power production so as to make the project economically feasible." This decision also refers to the declaration of policy contained in Section 1 of the Act of Congress of June 22, 1936, 49 Stat. 1570, 33 U.S.C.A. § 701a, which states in part:

"It is hereby recognized that destructive floods upon the rivers of the United States, upsetting orderly processes and causing loss of life and property, including the erosion of lands, and impairing and obstructing navigation, highways, railroads, and other channels of commerce between the states, constitute a menace to national welfare; * * *."

It was held in the case of United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, that the New River from Allisonia, Virginia, to Hinton, West Virginia, is a navigable water of the United States; and in the case of State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 1058, 85 L.Ed. 1487, Mr. Justice Douglas said: "It is clear that Congress may exercise its control over the non-navigable stretches of a river in order to preserve or promote commerce on the navigable portions."

Although the Bluestone Dam is referred to as a "multiple-purposes" project, it is evident that our Circuit Court of Appeals, in establishing the right of the United States to condemn land for this project, regarded flood control as the primary purpose which Congress was pursuing in authorizing construction of the Bluestone Dam, and the production of electric power as an incidental purpose. United States v. West Virginia Power Co., supra. It held in this case in effect that Congress has the absolute power to determine the proportion which the one purpose shall bear to the other, and that Congress having so determined, the courts are bound thereby. As was said by Mr. Justice Douglas in the case of State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., supra:

"We are not concerned here with the question as to the authority of the federal government to establish on a non-navigable stream a power project which has no relation to, or is not a part of, a flood control project. While this reservoir is a multiple purpose project, it is basically one for flood control. There is no indication that but for flood control it would have been projected. It originated as part of a comprehensive program for flood control. * * *

"It is true that the power phase of this project in purpose and effect will carry some of the costs of flood control. The Division Engineer estimated that the annual deficit of $287,000 from flood control would be offset by an annual profit of $404,310 from power, leaving an annual net profit of $117,000. But the fact that Congress has introduced power development into this project as a paying partner does not derogate from the authority of Congress to construct the dam for flood control, including river flow. The power project is not unrelated to those purposes. The allocations of cost and storage between power and flood control, however significant for some purposes, cannot conceal the flood control realities of this total project. * * *

"Whether the work of flood-control, including river flow, would be better done by a dam of one design or another is for Congress to determine. And, as we have said, the fact that ends other than flood control will also be served, or that flood control may be relatively of lessor importance does not invalidate the exercise of the authority conferred on Congress."

Whatever might be held in cases where an unsubstantial portion of the project is devoted to the purpose of flood control, it is clear that in the Bluestone project no such unsubstantiality exists.

The inquiry then must be: (1) Does the United States possess a dominant easement in the waters of a navigable stream for purposes of flood control as distinguished from navigation control or improvement; or, in the alternative, (2) is flood control one phase of navigation control or improvement?

The Power Company persuasively traces the course of the Federal Government's power to control and improve navigation to a source which it says antedates the Constitution of the United States and of the several States, and is to be found in the common law. It is a natural servitude, says the Power Company, arising from the natural characteristics of navigable streams as arteries of trade and commerce. It argues that, although the power of the Federal Government to control and improve navigation is a power which was transferred to it from the States by the commerce clause of the Constitution, yet the natural servitude was not thereby in any degree enlarged, remaining strictly limited by the bounds of navigation control and improvement.

It may be doubted whether this so-called "natural" servitude is confined within the strict limits outlined by the Power Company. It is true that the plying of boats and other instrumentalities of commerce upon navigable streams is made possible by a natural accumulation of water in those streams, and to that extent the servitude may be said to be a "natural" one. But it is no less true that recurrent floods have disastrous results which are not bounded by State lines, nor limited in their effect upon commerce to interruption or retardation of navigation. State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., supra. Since it is now well established that the United States has the power to control floods in its great rivers by comprehensive systems of dams in the streams, it would appear that riparian lands may be subject to a "natural" servitude for this purpose no less than for the purpose of controlling or improving navigation, in the strict sense of that term.

■ It is unnecessary, however, to decide this point, since I have concluded from a careful examination of all the authorities cited, both by the petitioner and the Power Company, that control of floods in navigable rivers is of itself essentially control of navigation. It may be true, as argued by the Power Company, that the court must take notice of the fact that New River between Hinton and Gauley Bridge, West Virginia, is a rocky gorge, and that it is impossible ever to render that stretch of it navigable in fact. Nevertheless, it is navigable above Hinton, and it is navigable below Gauley Bridge, though under another name. Neither in its upper reaches nor in its lower reaches can it be said that navigation of the river will not be controlled and improved by the construction of the Bluestone Dam. The navigable portion above Hinton will be deepened and widened, and its usability for transportation of vessels will be materially improved; and by the control of floods in the Kanawha, Ohio, and Mississippi Rivers, the dam will help to prevent interruption of and damage to navigation in those streams by maintaining, in connection with other flood control dams on tributaries of these rivers, a constant and even flow of the waters.

The following cases, in addition to the cases already cited, sustain the conclusion which I have reached: United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; United States v. Chicago, M., St. P. & P. R. R. Co., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064; United States v. Washington Water Power Co., D.C., 41 F.Supp. 119; Id., 9 Cir., 135 F.2d 541.

Like Judge Schwellenbach, who decided the last mentioned case in the District Court, I am reluctant to adopt a rule of evidence in this case which will exclude the Power Company from recovery of the large sums of money which it has expended in acquiring and developing this land for water power purposes; but I am forced to the conclusion that the case is governed by the principle announced in United States v. Appalachian Electric Power Co., supra [311 U.S. 377, 61 S.Ct. 298, 85 L.Ed. 243], wherein the court said: "We are dealing here with the sovereign powers of the Union, the Nation's right that its waterways be utilized for the interests of the commerce of the whole country. * * * The Federal Government has domination over the water power inherent in the flowing stream. It is liable to no one for its use or non-use. The flow in a navigable stream is in no sense private property; 'that the running water in a great navigable stream is capable of private ownership is inconceivable.' Exclusion of riparian owners from its benefits without compensation is entirely within the Government's discretion."

From what I have said, it is apparent that the answers to the questions presented, with the exception of petitioner's number 3, and the Power Company's number 1, must be as follows:

■ Petitioner's number 1: "No."

■ Petitioner's number 2: "No."

■ Power Company's number 2a: "Yes," except that the value of the property for water power and dam site purposes may not be considered.

Power Company's number 3: "No."

■ Power Company's number 4: "None."

Power Company's number 5: "None," except insofar as it aids the court in reaching the conclusions herein announced.

■ Power Company's number 6: "No."

The Power Company claims to be the owner of certain rights in three tracts of land aggregating seventy acres owned by J. A. Fox and others, located within the reservoir area near Bull Falls on New River. These rights were acquired by the Appalachian Electric Power Company, an affiliate of the Power Company, for use in the development of the general private water power project. They are not included in the condemnation proceedings. There is nothing in the record to show the present ownership of these rights, but the Power Company states in its brief that it acquired them from the Appalachian Electric Power Company on February 24, 1936.

The original deed from Fox conveyed to S. B. Thomas, Trustee, certain water power rights at Bull Falls, together with, as much land as might be necessary for a location for a dam site, "and a power house to be built and used in connection therewith;" also, a sufficient quantity of land to be used for houses for the superintendent and other employees, not to exceed three acres; also, a right of way for ingress and egress; and the right to occupy and use so much of the land as might be necessary for construction and storage purposes during the building of a privately constructed dam across New River.

It is claimed by the Power Company that although the condemnation proceedings do not on their face include these property rights, yet the Power Company is entitled to an award in this proceeding for their value. It is further claimed that the conveyance by Fox, followed by other mesne conveyances, vested in the Power Company fee simple title to two tracts within the seventy-acre boundary, which, although not specifically described, are nevertheless ascertainable.

■ I am of opinion that the Power Company is not entitled in this proceeding to an award of compensation for any property rights in the aforesaid seventy acres. The only possible value of the easements owned by it in these lands is their value for water power purposes. In view of my conclusions announced above, there can be no such value as against the United States. As to the claimed ownership of a part of the lands in fee simple, it is clear to me that the grant was one upon a condition precedent, and that this condition was that the water power project contemplated by the parties to the deed

304

be carried out. This condemnation proceeding has made it impossible for the grantee in the deed or his assigns to build or operate any dam or power house on the land, or to have need of any superintendent or other employees in connection with the power project, and has made unnecessary any rights of way for ingress or egress to the dam site. Therefore, in my opinion, the condition has failed and the Power Company has no rights in this property which are compensable.

The answer to question number 3 of petitioner and question number 1 of Power Company is "No."